In the MATTER OF DISCIPLINARY PROCEEDINGS AGAINST
Joseph W. WEIGEL, Attorney at Law:

OFFICE OF LAWYER REGULATION,
Complainant-Respondent,

v.

Joseph W. WEIGEL,
Respondent-Appellant.

Supreme Court

*No. 2010AP1523–D. Oral argument January 13, 2012.
—Decided June 29, 2012.*

2012 WI 71

(Also reported in 817 N.W.2d 835.)

For the respondent-appellant there were briefs by *Terry E. Johnson, William F. Sulton* and *Peterson, Johnson & Murray, S.C.*, Milwaukee, and oral argument by *Terry E. Johnson.*

For the complainant-respondent there was a brief by *Paul W. Schwarzenbart* and *Lee, Kilkelly, Paulson & Younger, S.C.*, Madison, and oral argument by *Paul W. Schwarzenbart.*

¶ 1. PER CURIAM. Attorney Joseph W. Weigel appeals Referee Christine Harris Taylor's report and recommendation that his license to practice law in Wisconsin be suspended, and that he should pay the costs of the disciplinary proceeding. Attorney Weigel argues that the referee erroneously concluded he committed the misconduct alleged in the OLR's complaint.

¶ 2. On review, we accept the referee's factual findings and her conclusions with respect to the first two counts alleged in the disciplinary complaint. We dismiss the third count and we have concluded that a public reprimand is sufficient discipline for Attorney Weigel's misconduct. Attorney Weigel shall pay the costs of this proceeding.

¶ 3. Attorney Weigel was admitted to practice law in Wisconsin in 1960. He is a personal injury attorney practicing in Milwaukee. He was previously disciplined by private reprimand on January 26, 1979, for failing to promptly notify a client of the adverse result in her damages action against an opposing party and insurance company.

¶ 4. The background giving rise to this proceeding stems from the contentious dissolution of a Milwaukee law firm. The Office of Lawyer Regulation (OLR) filed a

132

complaint against Attorney Weigel on June 21, 2010. The complaint alleged that Attorney Weigel had: (1) entered into an impermissible non-competition agreement contrary to former SCR 20:5.6(a);[1] (2) misled clients and the public by continuing to use the firm name "Eisenberg, Weigel, Carlson, Blau & Clemens, S.C." contrary to SCR 20:7.1(a)(1),[2] SCR 20:7.5(a),[3] and SCR 20:8.4(c);[4] and (3) paid impermissible bonuses to a paralegal contrary to SCR 20:5.4(a)(3).[5] The parties

---

[1] Effective July 1, 2007, substantial changes were made to the Wisconsin Supreme Court Rules of Professional Conduct for Attorneys, SCR Chapter 20. *See* S. Ct. Order 04–07, 2007 WI 4, 293 Wis. 2d xv, 726 N.W.2d Ct.R-45 (eff. July 1, 2007); and S. Ct. Order 06–04, 2007 WI 48, 297 Wis. 2d xv, 730 N.W.2d Ct.R.-29 (eff. July 1, 2007). Because the conduct underlying this case arose prior to July 1, 2007, unless otherwise indicated, all references to the Wisconsin Supreme Court Rules will be to those in effect prior to July 1, 2007.

Former SCR 20:5.6(a) provided that a lawyer shall not participate in offering or making "a partnership or employment agreement that restricts the rights of a lawyer to practice after termination of the relationship, except an agreement concerning benefits upon retirement; . . . ."

[2] Former SCR 20:7.1(a)(1) stated:

A lawyer shall not make a false or misleading communication about the lawyer or the lawyer's services. A communication is false or misleading if it:

(1) contains a material misrepresentation of fact or law, or omits a fact necessary to make the statement considered as a whole not materially misleading; . . . .

[3] Former SCR 20:7.5(a) stated, in pertinent part, that "[a] lawyer shall not use a firm name, letterhead or other professional designation that violates Rule 7.1."

[4] Former SCR 20:8.4(c) stated it is professional misconduct for a lawyer to "engage in conduct involving dishonesty, fraud, deceit or misrepresentation; . . . ."

[5] Former SCR 20:5.4(a)(3) provided as follows: "A lawyer

filed a partial stipulation of facts. The referee conducted an evidentiary hearing on January 12, 2011.

¶ 5. On March 17, 2011, the referee issued a report containing extensive factual findings and concluding that the OLR had proven its case with respect to all three counts. The referee recommended a 60–day suspension and imposition of costs. Attorney Weigel appealed.[6]

¶ 6. A referee's findings of fact will not be set aside unless clearly erroneous. Conclusions of law are reviewed de novo. *See In re Disciplinary Proceedings Against Eisenberg,* 2004 WI 14, ¶ 5, 269 Wis. 2d 43, 675

---

or law firm shall not share legal fees with a nonlawyer, except that . . . (3) a lawyer or law firm may include nonlawyer employees in a compensation or retirement plan, even though the plan is based in whole or in part on a profit-sharing arrangement."

[6] Attorney Weigel moved to stay briefing on the appeal and to reopen the record based on his claim that "new evidence" undermined the credibility of certain witnesses who testified against him at the evidentiary hearing. This court remanded the matter to the referee. On May 24, 2011, Referee Taylor recommended that the court deny Attorney Weigel's motion to reopen the record. The referee found that the alleged newly discovered evidence was not material to and had no relation to any of the three claims for discipline. On May 26, 2011, this court issued an order stating that Attorney Weigel would have 20 days to appeal the referee's recommendation on the motion to reopen the record. On June 24, 2011, Attorney Weigel requested an extension of time to appeal that recommendation. On July 12, 2011, this court issued an order denying the motion to extend the time, but stated that the parties could address the recommendation to deny the motion to reopen in their appellate briefs on the disciplinary matter.

Attorney Weigel mentioned the motion to reopen the record in his Statement of the Case, but did not develop his argument. Accordingly, we accept the referee's recommendation and we deny Attorney Weigel's motion to reopen the record.

N.W.2d 747. This court is free to impose whatever discipline it deems appropriate, regardless of the referee's recommendation. *See In re Disciplinary Proceedings Against Widule,* 2003 WI 34, ¶ 44, 261 Wis. 2d 45, 660 N.W.2d 686.

¶ 7. Some background is necessary to assess the first two charges against Attorney Weigel. In 1975 Attorney Alvin Eisenberg, already an experienced lawyer, organized the law firm of Alvin H. Eisenberg, S.C., as a service corporation. Attorney Eisenberg was the sole shareholder.

¶ 8. In 1990 six attorneys, including Attorney Weigel, acquired shares in the Eisenberg firm. On March 1, 1999, Attorney Weigel became the president of the firm, which was known during the relevant period as Eisenberg, Weigel, Carlson, Blau & Clemens, S.C.

¶ 9. On March 11, 1999, Attorney Weigel, on behalf of the firm, entered into a Stock Redemption Agreement by which the firm redeemed all of Attorney Eisenberg's shares of stock. As a condition of the redemption, the firm agreed to employ Attorney Eisenberg under an Employment Agreement on a month-to-month basis, with the right to terminate his employment on 30 days' written notice.[7] The Employment Agreement contained

---

[7] Paragraph 7 of the Stock Redemption Agreement defined Attorney Eisenberg's post-agreement relationship with the firm as follows:

> After Closing, the Corporation will employ Eisenberg strictly as an employee, pursuant to the terms of the Employment Agreement, a copy of which is attached to this Agreement as Exhibit "E," . . . . The Corporation may continue to include Eisenberg's name in the name of the Corporation, and use his name in advertising and/or promotional materials for so long as he remains an employee of the Corporation, subject always to the Rules of Professional Responsibility in effect. At Eisenberg's option, the Corporation will list him "of counsel." For so long as the Corpora-

a covenant against competition which specified that Attorney Eisenberg was prohibited from practicing law in the Greater Milwaukee area for a period of six months after he ceased to be employed by the firm. As relevant here, paragraph 1 of the Employment Agreement provided:

> Employment. The Employer hereby hires the Employee as an attorney and the Employee does hereby accept such employment upon the terms and conditions hereinafter set forth and agrees to perform the professional duties required of him to the best of his ability. The parties agree that the Employee will spend most of his time on public relations, promotion, and advertising. The Employee will have managerial control over the Employer's programs for public relations, promotion, and advertising, and will have a reasonable budget to conduct such programs. The Employee will report directly to Joseph W. Weigel, President and Senior Partner, and no one else.

¶ 10. The Employment Agreement stated Attorney Eisenberg was entitled to employee benefits "customarily received by other attorneys employed by Employer," including malpractice insurance, bar association dues, and payment for professional seminars. It also required the firm to provide facilities, equipment, supplies, and personnel necessary for Attorney Eisenberg's performance of his "professional duties."

¶ 11. The covenant at issue, in paragraph 11 of the Employment Agreement, states:

tion uses Eisenberg's name in any manner (in the firm name, as "of counsel," in promotional material, in advertising, in public relations, or otherwise) Eisenberg will have the right to disapprove the placement and content of any advertising, public relations, and/or promotional material used by the Corporation, and the Corporation will comply.

136

Covenant against Competition. During Employee's employment hereunder and for a period of six months after he ceases to be employed by Employer or March 1, 2001, whichever is later, Employee shall not[] practice law in the Greater Milwaukee area (other than with Employer). It is agreed, however, that these restrictions shall not apply, should Employer terminate its business, cease to exist, or cause an Event of Default as defined in the Stock Redemption Agreement calling for this Employment Agreement, or breach any of the agreements called for by the Stock Sale Agreement.

¶ 12. In January 2005 the Firm, without giving prior notice to Attorney Eisenberg, moved its law office to a new location. A letter was left for Attorney Eisenberg saying there was no office space for him at the new location, that he should go home, and that his paychecks would be sent to him.

¶ 13. For months after the firm moved, it caused a truck with a sign mounted on both sides to be parked on a public street near the old office. The sign on the truck indicated the firm had moved and provided the new address.

¶ 14. On January 31, 2005, the firm sent a letter to clients saying that the office had moved and stated that "everything remained the same" including the "same attorneys" and phone number.

¶ 15. On February 8, 2005, Attorney Eisenberg's counsel delivered a letter to Attorney Weigel, terminating Attorney Eisenberg's employment with the Firm and requesting the Firm stop using the Eisenberg name. The letter stated:

Enclosed please find a letter I am hand delivering on behalf of Alvin H. Eisenberg. Please note that your firm should immediately cease and desist using Mr.

137

Eisenberg's name in the name of your firm and/or any advertising or promotional material.

¶ 16. Enclosed with the February 8, 2005 letter was a letter to Attorney Weigel from Attorney Eisenberg stating:

> I am hereby giving you this notice of termination of my employment with the law firm of Eisenberg, Weigel, Carlson, Blau & Clemens, S.C. Because I regard the law firm as being in breach of both my Employment Agreement and Stock Redemption Agreement, I do not believe that this notice is necessary but I am nonetheless giving it to avoid future arguments as to my employment status.
>
> Also, please accept this letter as notice that you are to immediately cease and desist using the name "Eisenberg" and that it should be removed from the name "Eisenberg, Weigel, Carlson, Blau & Clemens, S.C." I withdraw my consent and disapprove of any further use of my name in any advertising, public relations and/or promotional material used by your law firm.

¶ 17. On February 9, 2005, Attorney Weigel executed and arranged for the Firm's counsel to deliver a proposed agreement to Attorney Eisenberg. The proposed agreement made explicit reference to the covenant against competition in the Employment Agreement.

¶ 18. On February 10, 2005, Attorney Eisenberg's counsel delivered a letter to the Firm's counsel stating, among other things, that:

> [w]hile Mr. Eisenberg is willing to enter into an agreement separating himself from the law firm, by presenting the enclosed draft, I do not want to cancel his previous instruction that the law firm immediately discontinue using his name.

138

¶ 19. Attorney Eisenberg's counsel sent letters on February 11, 2005, and February 14, 2005, continuing to protest the firm using Attorney Eisenberg's name and asking the firm to cease and desist using "Eisenberg" in the firm's name.

¶ 20. By letter dated February 16, 2005, the Firm's counsel asserted that under the Employment Agreement "the present ownership has the right to use the Eisenberg name until the 30 days has expired." The firm asserted that if Eisenberg's resignation letter of February 8, 2005, was assumed to provide such notice, the 30 days would expire on March 10, 2005, and at such time "the present ownership would be legally required to cease using the name Alvin H. Eisenberg."

¶ 21. By letters dated February 17, 2005, and February 28, 2005, Attorney Eisenberg's counsel renewed his objections to the firm's continued use of the Eisenberg name.

¶ 22. After the move to the new office and until March 2005, the firm continued to display in the client waiting area a framed photo of former Green Bay Packer football player Reggie White which contained the handwritten statement:

> Happy birthday Mr. Alvin Eisenberg. Thank you for your caring heart. You are a Humble man. May our Lord Jesus the Son of Jehovah God Bless You. Reggie White # 92[.] 1 Cor. 13.

¶ 23. On March 3, 2005, the firm, still using the Eisenberg name, entered into an agreement with a lawyer named Donald S. Eisenberg. At the time, Donald Eisenberg was engaged in an "of counsel" relationship with a Madison law firm and was not affiliated with the firm in any way. Donald Eisenberg was never a shareholder or an employee of the firm. Pursuant to the agreement, Donald Eisenberg was paid a flat sum of

$1,500 per month, with no FICA deductions or tax withholdings from the payments, as long as he maintained a license to practice law, whether or not he did anything for the firm. He spent little time in the firm's office.

¶ 24. The firm then affixed a name plate stating "Mr. Eisenberg" on an office door at the new office.

¶ 25. Sometime after March 3, 2005, Attorney Weigel signed a letter for the firm and mailed it to certain clients. The letter stated:

> We have MOVED our offices to 3732 West Wisconsin Avenue, Suite 300[,] Milwaukee, Wisconsin 53208[.] *Everything else remains the same!* The same friendly, dedicated staff to help you—including *the same attorneys;* medical doctor, engineer, paralegals; specialists; investigators and support staff!
>
> Our "numbers" remain the same: phone numbers of (414) 342–1000 and (800) 486–0106[;] fax number of (414) 342–5060
>
> We all invite you to stop in and see our bright, newly remodeled (all on one floor) offices. (Emphasis added).

¶ 26. In March 2005 and for some time thereafter, the firm ran television advertisements referring to the move of its office location and stating that:

> Eisenberg, Weigel, Carlson, Blau and Clemens, injury attorneys. We have moved to 3732 West Wisconsin Avenue. *Everything remains the same. The same friendly, dedicated staff to help you, including the same attorneys,* medical doctor, engineer, paralegals, specialists, investigators and support staff. Our numbers remain the same, (414) 342–1000. We all invite you to stop in and see our bright, newly remodeled offices. (Emphasis added).

140

¶ 27. On March 14, 2005, Attorney Weigel filed a grievance against Alvin Eisenberg, asserting that Attorney Eisenberg was contacting clients of the firm in violation of the supreme court rules. The grievance referred to the restrictive covenant in the Employment Agreement.

¶ 28. On April 7, 2005, Attorney Eisenberg filed suit in Milwaukee County Circuit Court against the firm and its shareholders, including Attorney Weigel, asserting claims for breach of contract, unfair competition, contract interference, statutory false advertising, and theft. The firm filed a counterclaim seeking to enforce the restrictive covenant against Attorney Eisenberg.[8] Meanwhile, on May 12, 2005, Attorney Eisenberg filed a grievance against Attorney Weigel complaining of the firm's continued use of his name.

¶ 29. In subsequent correspondence with the OLR, Attorney Weigel took the position that Attorney Eisenberg was retired and maintained that the firm was justified in continuing to use the name Eisenberg as part of the firm's name.

¶ 30. The first count of the OLR complaint alleges that by executing an agreement with a "non-compete" clause, Attorney Weigel violated SCR 20:5.6(a). Supreme court rule 20:5.6(a) provided that:

---

[8] The civil action was resolved by a settlement pursuant to which the firm ceased using the name Eisenberg in the firm's name and letterhead. In accordance with the settlement, the firm filed an amendment with the Wisconsin Department of Financial Institutions changing its name to Weigel, Carlson, Blau & Clemens, S.C. The Of Counsel Agreement with Donald Eisenberg was terminated in December 2006 at the same time the firm reached the agreement to settle the civil action with Attorney Alvin Eisenberg.

A lawyer shall not participate in offering or making:

(a) a partnership or employment agreement that restricts the rights of a lawyer to practice after termination of the relationship, except an agreement concerning benefits upon retirement; . . . .

¶ 31. Attorney Weigel acknowledges that the Stock Redemption Agreement "restricts the rights of a lawyer to practice after termination of the relationship." However, Attorney Weigel argues that the clause does not violate SCR 20:5.6(a) because it was an agreement "concerning benefits upon retirement." Attorney Weigel argues that "[e]ven though the Stock Redemption Agreement states that Eisenberg is to be employed as an attorney, that was not the intent of the parties to the contract and they clearly did not follow it." Attorney Weigel points to various aspects of Attorney Eisenberg's testimony where Attorney Eisenberg described himself or was described as having "retired." Attorney Weigel adds that the clause was added at Attorney Eisenberg's request and contends that this is a purely contractual dispute, citing SCR 20:1.17.

¶ 32. The referee rejected Attorney Weigel's arguments finding that the Stock Redemption Agreement does not refer or conform to SCR 20:1.17. The Agreement does not use the word "retire" and it did not provide that Attorney Eisenberg would cease to practice law. Indeed, the referee found, and the record supports the finding, that Attorney Eisenberg continued to meet with clients and continued to serve as the face of the firm in the same manner as before the agreements were executed.

¶ 33. We accept the referee's findings of fact and her conclusion that the non-competition clause in the Employment Agreement violated SCR 20:5.6(a). We agree that while Attorney Eisenberg may have wanted, for some purposes, to portray himself as retired or semi-retired, that does not turn the Employment Agreement into a "retirement agreement."

¶ 34. Attorney Weigel has challenged the referee's finding that he was motivated by greed in entering into the non-compete agreement, emphasizing that the provision was inserted at the insistence of Attorney Eisenberg's attorney. However, as the referee found, Attorney Weigel aggressively sought to enforce the non-compete clause against Attorney Eisenberg. We accept the referee's findings, and we agree that the execution of and efforts to enforce the non-compete clause violated SCR 20:5.6(a).

¶ 35. The second count of the OLR complaint alleged that Attorney Weigel misled clients and the public by continuing to use the firm name "Eisenberg, Weigel, Carlson, Blau & Clemens, S.C." contrary to SCRs 20:7.1(a)(1), 20:7.5(a), and 20:8.4(c).

¶ 36. Supreme court rule 20:7.1(a)(1) provided:

A lawyer shall not make a false or misleading communication about the lawyer or the lawyer's services. A communication is false or misleading if it:

(1) contains a material misrepresentation of fact or law, or omits a fact necessary to make the statement considered as a whole not materially misleading; . . . .

¶ 37. Supreme court rule 20:7.5(a)[9] in turn provided, in pertinent part, that "[a] lawyer shall not use a firm name, letterhead or other professional designation that violates Rule 7.1."

¶ 38. Supreme court rule 20:8.4(c) provided that it is misconduct for a lawyer to "engage in conduct involving dishonesty, fraud, deceit or misrepresentation."

¶ 39. The crux of this claim is that despite the abrupt termination of Attorney Eisenberg's relationship with the firm and his repeated demand that the firm cease using his name, Attorney Weigel implied to clients and the public that Attorney Alvin Eisenberg was still associated with the firm, as evidenced by, among other things, advertising that the "same lawyers" were with the firm, advertising that "everything remained the same," continuing to display Alvin Eisenberg's memorabilia in the new office, and affixing the nameplate "Mr. Eisenberg" on an office door.

¶ 40. Attorney Weigel asserts that the firm "was free to employ Donald S. Eisenberg." That is not the issue. The issue is the firm using the "of counsel" relationship with Donald Eisenberg as a pretext for continuing to use the name "Eisenberg" as the lead name for a law firm founded by Alvin Eisenberg after the abrupt and contentious termination of Alvin Eisenberg's relationship with the firm. Attorney Weigel continued to use "Eisenberg" in the firm name after March 10, 2005, the date he concedes Alvin Eisenberg was no longer an employee of the firm.[10]

---

[9] The caption of Count II of the complaint contained a scrivener's error identifying the rule at issue as SCR 20:7.5(c), but footnote 3 to the complaint correctly identified the operative rule as SCR 20:7.5(a).

[10] On February 16, 2005, counsel for the firm conceded that as of March 10, 2005, "the present ownership would be legally required to cease using the name Alvin H. Eisenberg."

¶ 41. The referee found, and we agree, that when faced with losing the name of the firm's founding member, Attorney Weigel entered into an agreement with another Mr. Eisenberg, Donald Eisenberg, to have a pretext for continuing to use Eisenberg in the firm's name. Donald had no prior relationship with the firm and was not an employee, much less a shareholder, of the firm. This, coupled with advertising telling the public that "nothing had changed" was misleading, and we agree with the referee's conclusion that this conduct violated the aforementioned rules of professional conduct.

¶ 42. The third count of the OLR complaint involves the payment of certain bonuses to a paralegal. The paralegal has been employed by the firm since approximately 1990 and works in the personal injury practice as part of a group of lawyers and nonlawyer assistants referred to as the "Weigel Team." She provides services at the file preparation and settlement stages of cases. Attorney Weigel supervises the Weigel Team.

¶ 43. Some of the nonlawyer personnel employed by the firm, including this paralegal, are compensated on an "incentive" or "bonus" system. The paralegal is compensated for her services as follows: She is paid a base hourly wage ($7.00 or $7.50 per hour) plus overtime pay for work in excess of 40 hours per week and on weekends, as mandated by the Fair Labor Standards Act.

¶ 44. In addition to her base pay, the paralegal receives two forms of bonus: (1) thirty cents per thousand dollars (three-tenths of one percent) of the gross recoveries from personal injury cases she worked on; and (2) a quarterly bonus consisting of $1,500 plus

145

■

$250 per thousand (25 percent) of the difference between a weekly average (computed quarterly, over 13 weeks) of gross recoveries from personal injury cases she worked on and her weekly goal of $127,500 per week.

¶ 45. The OLR contends that this bonus arrangement constitutes unlawful fee splitting in violation of SCR 20:5.4(a)(3), which provided that a lawyer or law firm shall not share legal fees with a nonlawyer, except that "a lawyer or law firm may include nonlawyer employees in a compensation or retirement plan, even though the plan is based in whole or in part on a profit-sharing arrangement."

■

¶ 46. Supreme court rule 20:5.4 is based on the American Bar Association's Model Rule 5.4 which "clearly prohibits fee 'splitting' with paralegals." *See ABA Model Guidelines for the Utilization of Paralegal Services* (2004). The underlying purpose of the fee-splitting rule is to guard the professional independence of a lawyer.[11] It seeks to avoid the situation where a nonlawyer with a financial stake in the outcome of a case could influence how that case is handled, for instance by pressuring the lawyer either to settle faster or to hold out for more, based on the nonlawyer's financial interest.

---

[11] Comment [1] to ABA's model rule 5.4, upon which SCR 20:5.4 was based, states:

The provisions of this Rule express traditional limitations on sharing fees. These limitations are to protect the lawyer's professional independence of judgment. *Where someone other than the client pays the lawyer's fee or salary,* or recommends employment of the lawyer, that arrangement does not modify the lawyer's obligation to the client. . . . (Emphasis added).

146

¶ 47. As a practical matter, of course, a law firm's profits result almost entirely from legal fees. So, in a sense, even paying nonlawyer employees a salary could, technically, be viewed as a sharing of fees, because fees are the firm's source of revenue. *See, e.g.,* Ethics Opinion 322 (D.C. Bar, Feb. 16, 2004).

¶ 48. However, it is well settled that a lawyer may compensate a nonlawyer assistant based on the quantity and quality of their work and the value of that work to the law practice. Thus, in addition to regular compensation, paralegals and legal assistants routinely and properly receive discretionary merit-based bonuses or bonuses based on the overall success of the firm. *See, e.g.,* State Bar of Georgia Formal Advisory Opinion No. 05–4. The ethical issues arise when the nonlawyer's compensation is tied too directly to specific clients, cases or work performed by the nonlawyer such that the professional independence of the lawyer is compromised.

¶ 49. Attorney Weigel argues this bonus arrangement is permissible, asserting that it "is tied to the total performance of the firm in obtaining gross recoveries for all clients" and that it is "not based upon specific fees from specific cases." Attorney Weigel notes the OLR failed to show that any specific client was affected by this system.

¶ 50. A Wisconsin case directly addressing the "fee splitting" aspect of SCR 20:5.4 is *In re Disciplinary Proceedings Against Van Cura,* 178 Wis. 2d 612, 504 N.W.2d 610 (1993). There, we ruled that it was impermissible for a law firm to enter into an agreement whereby a consulting firm would finance a law firm's product liability litigation in return for half of the fees the law firm collected from any products liability litiga-

tion. This case is factually distinguishable and provides minimal guidance to practitioners regarding whether this particular bonus system is permissible.

¶ 51. A review of ethics decisions from other jurisdictions indicates that "the line between the prohibited sharing of legal fees with a nonlawyer and a permissible compensation plan based on profit-sharing is not clearly demarcated." *See* Ethics Opinion 322 (D.C. Bar, Feb. 16, 2004).

¶ 52. Generally, bonuses are deemed permissible where the bonus is not tied to fees generated from a particular case or class of cases from a specific client. *See, e.g.,* Philadelphia Bar Ass'n Prof. Guidance Comm., Op. 2001–7 (July 2001); Va. St. Bar Standing Comm. of Legal Ethics, Op. 885 (Mar. 11, 1987) (a nonlawyer may be paid based on the percentage of profits from all fees collected by the lawyer).

¶ 53. By contrast, a Florida ethics committee concluded that "[b]onuses to non-lawyer employees *cannot* be calculated as a percentage of the firm's fees or of the gross recovery in cases on which the non-lawyer worked." *See* Florida Ethics Opinion 89–4 (emphasis supplied); *see also Matter of Struthers,* 877 P.2d 789 (Ariz. 1994) (an agreement to give to nonlawyer all fees resulting from nonlawyer's debt collection activities constitutes improper fee splitting); *Florida Bar v. Shapiro,* 413 So. 2d 1184 (Fla. 1982) (payment of contingent salary to nonlawyer based on total amount of fees generated is improper); State Bar of Montana, Op. 95–0411 (1995) (lawyer paid on contingency basis for debt collection cannot share that fee with a nonlawyer collection agency that worked with lawyer).

¶ 54. The OLR contends the bonus arrangement in this case is problematic in several respects. It involves the splitting of revenues and the OLR contends

"that it has nothing to do with profits such that it does not fall within the profit-sharing safe harbor." The OLR notes the paralegal is entitled to a bonus if she meets certain goals—whether or not the firm was profitable —and that the payment to the nonlawyer, although computed on the basis of a client's gross recovery, comes out of the contingent fee earned by the firm.[12] The OLR explains that if the distribution of the client's gross recovery is viewed as a pie chart, and if the firm is entitled to a one-third percentage of the gross recovery, which is typical in contingency cases, the nonlawyer gets an approximate one percent slice of the fee, off the top, before expenses, prior to any computation of "profit," that is, total revenues less total expenses on a firm-wide basis.

¶ 55. We do not perceive a material ethical distinction between profit-sharing and revenue-sharing for purposes of this bonus calculation. The ethical considerations are the same.

¶ 56. The potential ethical concern here stems from the fact that the employee's bonus is based upon net profits of a specific law practice area, rather than upon the net profits of the law firm's entire practice.

¶ 57. To determine whether this bonus system runs afoul of SCR 20:5.4 we consider the original intent of rule, which is to protect a lawyer's exercise of independent professional judgment. Arguably, a parale-

---

[12] There is a potential ethical concern if the paralegal bonus is viewed as coming directly out of the client's gross recovery and not out of the attorney's fee. This could constitute facilitating a nonlawyer receiving a contingent fee from the client. *See Bergantzel v. Mlynarik,* 619 N.W.2d 309, 312–18 (Iowa 2000) (agreement entitling nonlawyer to contingent fee for negotiating an underinsured motorist (UIM) claim constituted unauthorized practice of law and could not be enforced).

gal always has some interest in maximizing the lawyer's fee income because the paralegal indirectly receives compensation generated from attorney's fees which are, themselves, generated by recoveries by clients. In that respect, however, the paralegal is no different than every nonlawyer employee of every law firm whose income is principally derived from contingent fee recoveries.

¶ 58. We do not have specifics about the number of cases this paralegal works on, but the record indicates this is a high volume legal practice. Based on the evidence presented we find no indication that the paralegal would be interfering with the lawyer's independent judgment. We emphasize that the law firm has a general duty, and the paralegal's lawyer-supervisor has a specific duty, to ensure that the paralegal's conduct is compatible with the ethical obligations of lawyers. However, we conclude that the rule, as drafted, does not preclude the bonus structure described in this case. Accordingly, we dismiss the third count of the complaint related to the bonus structure used to compensate certain paralegals.

¶ 59. We turn to the appropriate discipline for Attorney Weigel's misconduct. The referee recommended a 60–day suspension based on her findings and conclusion that the OLR had proved all three of the counts alleged in the disciplinary complaint. She noted this case included certain aggravating factors such as multiple violations, Attorney Weigel's substantial experience in the practice of law, and Attorney Weigel's refusal to acknowledge wrongdoing. The referee, quite properly, did not consider the prior discipline because it was remote in time. Upon our independent review of the record and the specific facts of this case, we are persuaded that a public reprimand is sufficient to achieve the goals of attorney discipline. Although we are per-

150

suaded a suspension is not necessary to protect the public and the judicial system in this instance, Attorney Weigel is admonished that a public reprimand should not be interpreted as indicating this court is untroubled by his misconduct. We conclude further that Attorney Weigel should be required to pay the full costs of this disciplinary proceeding, which are $17,447.28 as of January 20, 2012. No restitution was sought and none is ordered in this proceeding.

¶ 60. IT IS ORDERED that Joseph W. Weigel is publicly reprimanded for his professional misconduct.

¶ 61. IT IS FURTHER ORDERED that within 60 days of the date of this order, Joseph W. Weigel shall pay to the Office of Lawyer Regulation the costs of this proceeding. If the costs are not paid within the time specified and Joseph W. Weigel has not entered into a payment plan approved by the Office of Lawyer Regulation, then the Office of Lawyer Regulation is authorized to move this court for a suspension of the license of Joseph W. Weigel to practice law in Wisconsin.

¶ 62. ANN WALSH BRADLEY, J. (*dissenting*). Today the majority interprets SCR 20:5.4(a) to allow fee splitting on particular cases with nonlawyer employees. Because I believe that this interpretation is contrary to both the purpose of the rule and to the interpretation of similar or identical fee-splitting rules enacted in other states, I respectfully dissent.

¶ 63. The court is asked to review three counts of alleged misconduct. In regard to the first two counts set forth in the complaint, the majority accepts the recommendation of the referee and concludes that Attorney Weigel should be disciplined. I agree.

¶ 64. However, the majority further concludes that the third count, involving the bonus structure used

151

to compensate certain nonlawyer employees, should be dismissed. It determines that the compensation scheme used in this case does not violate the fee-splitting rule, SCR 20:5.4(a). It is here that I part ways with the majority.

¶ 65. Supreme court rule 20:5.4(a), which is based on an ABA model rule, prohibits lawyers or law firms from sharing legal fees with nonlawyers. An exception allows, however, that they "may include nonlawyer employees in a compensation or retirement plan, even though the plan is based in whole or in part on a profit-sharing arrangement." SCR 20:5.4(a)(3).[1]

¶ 66. The underlying purpose of the rule is to guard the professional independence of the lawyer. As the majority correctly notes, "ethical issues arise when the nonlawyer's compensation is tied too directly to . . . work performed by the nonlawyer such that the professional independence of the lawyer is compromised." Majority op., ¶ 48. A person entitled to a portion of a lawyer's fees may attempt to influence the lawyer's activities so as to maximize those fees. Restatement (Third) of The Law Governing Lawyers § 10 cmt. b (2000).

¶ 67. A review of ethics opinions from other states with a similar or identical fee-splitting rule indicates that the rule permits certain bonuses to nonlawyer employees. For instance, the State Bar of Georgia determined that lawyers may pay a monthly bonus to nonlawyer employees based on the overall success of the firm. See State Bar of Georgia Formal Advisory Op. 05–4 (2007). Another ethics committee determined that

[1] The language of SCR 20:5.4(a)(3) was not affected by the changes to Chapter 20 which became effective on July 1, 2007. See S. Ct. Order 04–07, 2007 WI 4, 293 Wis. 2d xv, 726 N.W.2d Ct.R-45 (eff. July 1, 2007).

a law firm could compensate a nonlawyer based on a percentage of the firm's net profits of a specific law practice area. *See* Michigan Ethics Op. RI-143 (1992).

¶ 68. However, "compensating nonlawyer employees based on a percentage of the legal fees generated in the particular matters on which the nonlawyer worked has been held impermissible." Restatement (Third) of The Law Governing Lawyers § 10 cmt. e. *See, e.g.* Utah State Ethics Advisory Op. Comm., Op. 02–07 (2002) (lawyers or law firms may not compensate nonlawyers with bonuses that are "tied to specific fees from a particular case"); Philadelphia Bar Ass'n Prof. Guidance Comm., Op. 2001–7 (2001) (bonus is permissible "provided that the bonus is not tied to or contingent on the payment of a fee from a particular case or specific class of cases"); North Carolina State Bar, Op. RPC 147 (1993) (nonlawyer bonus impermissible because it was "calculated based upon a percentage of the income the firm derives from legal matters on which the paralegal has worked").

¶ 69. The majority reflects that in addition to her base pay, the paralegal at issue received "thirty cents per thousand dollars (three-tenths of one percent[2]) of the gross recoveries from personal injury cases she worked on." Majority op., ¶ 44.

¶ 70. The OLR contends that this bonus arrangement constitutes unlawful fee splitting under SCR 20:5.4. It explains:

> Whether or not the Firm was at any time profitable, [the paralegal] was entitled to receive three-tenths of one percent of the clients' gross recoveries in the

---

[2] It is unclear from the record whether the percentage used by the majority opinion is correct. However, for consistency we use the percentage as set forth by the majority.

personal injury cases she worked on. Weigel's assertion that the bonus is not based upon "specific fees from specific cases" is mere semantics . . . .

¶ 71. In its argument, the OLR emphasizes that the payment to the nonlawyer, although computed on the basis of a client's gross recovery, comes out of the contingent fee earned by the firm. It describes the fee as follows: ". . . viewing the distribution of the client's gross recovery as a pie chart, if the Firm is entitled to a one-third percentage of the gross recovery, the nonlawyer gets an approximate one percent slice of the fee, off the top, before expenses, prior to any computation of 'profit,' that is, total revenues less total expenses on a Firm-wide basis."

¶ 72. I find the argument of the OLR persuasive. It is consistent with the conclusions of the other jurisdictions referenced above which have interpreted similar or identical rules based on the ABA model code. Therefore, I determine that a formula, as used here, that compensates nonlawyer employees based on a percentage of the legal fees generated in the particular matters on which the nonlawyer worked, violates both the purpose and the plain prohibition set forth in SCR 20:5.4. Accordingly, although I join the majority in finding violations as to counts 1 and 2, I respectfully dissent as to the dismissal of the third count.

¶ 73. I am authorized to state that CHIEF JUSTICE SHIRLEY S. ABRAHAMSON joins this dissent.