¶ 112.
DAVID T. PROSSER, J.
(dissenting). This is a landmark case in attorney discipline. It addresses the issue of an attorney's ethical responsibilities when the attorney's client — or a witness called by the attorney — provides false testimony that the attorney knows is false at the time of the testimony or learns is false sometime after the testimony.
¶ 113. It is hard for a judge not to sound the trumpet and wave the flag for "the truth, the whole truth, and nothing but the truth" in judicial proceedings. No one in the judiciary is "for" false testimony. Yet the court's lead opinion, which emphatically embraces the necessity for "truth" injudicial proceedings, leaves me quite uncomfortable for a number of reasons.
¶ 114. First, this notable case will be associated with an attorney who was caught in the middle of a mess he did not create, whereas the two attorneys who *365 are responsible for the mess have been able to walk away with inadequate discipline or no discipline.
¶ 115. Second, I do not perceive that the respondent attorney set out to misrepresent critical facts to a referee. This is a case in which the attorney was "directed" by his senior partner to represent another attorney, without pay. When the attorney asked the "client" attorney questions on direct examination, the "client" attorney omitted important information from his answers, and when the "client" attorney answered questions on cross examination, he lied. This court determines that the respondent attorney assigned to represent the "client" attorney had an obligation "to take reasonable remedial measures" to correct his client's false testimony — even if the attorney did not learn of the falsity until sometime after the testimony was given — and that all attorneys have such a duty. However, the opinion does not say much about how this duty should be discharged.
¶ 116. Third, the lead opinion is a little light in discussion about the serious tension between privileged information, confidentiality, and loyalty to a client, on the one hand, and an attorney's obligation to the court, on the other.
¶ 117. Finally, the lead opinion is almost 50 pages in length because the court finds it necessary to resolve several close questions against the respondent attorney, but it reads as though the respondent attorney should have resolved all these subtle questions the same way the lead opinion has resolved them. . . without much difficulty. We ought to ask: Has the court provided sufficient guidance for the Wisconsin bar to avoid in the future the same pitfalls that the attorney faced in this case?
*366 1 — 1
¶ 118. The background facts in this case are complicated and murky. Several important facts are omitted from the lead opinion in an effort to eliminate uncertainty by simply ignoring it.
¶ 119. At one point, about 2000, Attorneys Alvin Eisenberg, Brian K. Polk, and the respondent, John Kenyatta Riley, all worked at the firm of Eisenberg, Weigel, Carlson, Blau, Reitz & Clemens, S.C. in Milwaukee.
¶ 120. Attorney Polk left the firm in June 2000 and permitted his license to be suspended in 2001 because of noncompliance with CLE.
¶ 121. Attorney Riley left the firm sometime in 2000-2001 to join another firm. He started his own law firm in Milwaukee in 2003.
¶ 122. In 1990 six attorneys acquired shares in the firm that Attorney Eisenberg had founded in 1958. In 1999 Joseph Weigel became president of that firm and engineered the redemption of all stock owned by Eisenberg. Thereafter:
In January 2005 the Firm, without giving prior notice to Attorney Eisenberg, moved its law office to a new location. A letter was left for Attorney Eisenberg saying there was no office space for him at the new location, that he should go home, and that his paychecks would be sent to him.
In re Disciplinary Proceedings Against Weigel, 2012 WI 71, ¶¶ 8, 9, 12, 342 Wis. 2d 129, 817 N.W.2d 835.
¶ 123. Ugly litigation followed Attorney Eisen-berg's departure from his old law firm, and soon, he started a new firm. He brought Brian Polk into the new firm no later than October 10, 2005, even though Polk's law license was suspended.
*367 ¶ 124. Eisenberg also brought Attorney Riley into the new firm sometime in 2005. The referee found as fact that, "[b]etween October 2005 and September of 2006, Attorney Riley was an associate at the Eisenberg law firm. Attorney Riley maintained his solo practice offices on Water Street for a short while after re-joining Attorney Eisenberg in practice. His work time was spent between both offices."
¶ 125. The referee also found that, "[Riley] practiced solo until early 2006 when he joined Eisenberg Law Office, which later came to be Eisenberg & Riley then Eisenberg, Riley & Muwonge, and in 2011 was Eisenberg, Riley & Zimmerman." (Emphasis added.)
¶ 126. Attorney Riley was not part of the new Eisenberg firm's personal injury group in which Polk worked. Rather, he had a general practice, which included bankruptcy, criminal, and real estate law. He often was in court when the personal injury group met.
¶ 127. These facts suggest that it is not entirely clear whether Attorney Riley knew the full story about Polk's role at the new Eisenberg firm. What is undisputed is that Polk filed a pro se petition for readmission to the bar on February 22, 2006; and because of opposition to reinstatement by the Office of Lawyer Regulation (OLR), this court appointed a referee, who conducted a hearing on September 6, 2006.
¶ 128. Attorney Eisenberg "directed" Attorney Riley to represent Polk at that hearing. The referee in this case found that "[t]he reinstatement hearing [in 2006] was pending at the same time law firm disputes and other practice concerns were in play." The referee in this case also found:
The attorney-client relationship between Attorney Riley and Brian Polk was limited to Attorney Riley *368 appearing at the reinstatement trial in a "second-chair" capacity. The representation did not include Attorney Riley's preparation of the witnesses, drafting of the petition, prior review of the record, strategy sessions or consultation, solicitation of testimony based on this reinstatement trial's court-ordered standards, attention to or analysis of answers to questions. [Attorney Riley] had not previously represented any clients in Reinstatement [and] disciplinary proceedings were not within Attorney Riley's usual area of practice.
(Citations omitted.)
¶ 129. The critical question is when Attorney Riley actually knew that Polk was improperly employed by the Eisenberg law firm. Did he know it on September 6, 2006, or did he learn it later?
¶ 130. The referee found that "Attorney Riley and Brian Polk spoke about his law firm employment during 2006 when he was serving as counsel for Brian Polk."
f 131. Attorney Riley disputes this finding. The lead opinion asserts that it was "not necessary that Attorney Riley knew that Attorney Polk was practicing law (as opposed to simply working) at the new Eisen-berg firm, in order for Attorney Riley to have violated former SCR 20:3.3(a)(4)," lead op., ¶ 47 (emphasis omitted), because "a lawyer has a duty to remediate false testimony given by a client, regardless of the manner in which the false testimony was given," id., ¶ 57. The lead opinion states that a lawyer had a duty to take reasonable remedial measures under former SCR 20:3.3(a)(4) when his client omitted an "important fact" from his answers on a subject that was "material." Id., ¶ 58.
*369 ¶ 132. What should be evident to everyone is that Alvin Eisenberg is the person responsible for employing Brian Polk, an attorney with a deeply troubled past, including a felony conviction and a citation for loitering-illegal drug activity, while Polk was suspended from the practice of law. Eisenberg tried hard to hide Polk's role in the firm. Eisenberg was purportedly paranoid that his rivals at the Weigel law firm would discover and disclose Polk's employment, discrediting Eisenberg and discrediting the firm. Eisenberg "directed" Attorney Riley to assist Polk at the reinstatement hearing. He knew he could not do it himself.
¶ 133. Eisenberg eventually was disciplined by OLR with a public reprimand. Public Reprimand of Alvin H. Eisenberg, 2012-8. However, his "public reprimand" is not published in the Wisconsin Reports, and it takes a little detective work even to find it online. Moreover, the reprimand reads in part:
In a May 10, 2008 response to this matter, Eisen-berg stated that, in March of 2006, he discovered Mr. X's license to practice law was suspended, causing Eisenberg to terminate Mr. X and tell him he could not return until his license was reinstated. Eisenberg further stated that, "[Mr. X] has not returned to this date."
This matter was referred to a district committee for investigation. Eisenberg denied to committee investigators that Mr. X had returned to work at the firm after being terminated in March of 2006 and denied that Mr. X used an assumed name. Eisenberg could give no explanation for letters that were produced that had been signed using the assumed name, and he denied authorizing or having knowledge of anyone in the firm using that name.
*370 In response to the committee report Eisenberg stated that, after reviewing records, he found that Mr. X worked for the firm for six days in July and August 2006. Eisenberg admitted that the firm's receptionist "keeps a detailed daily record of the employees' attendance as employees come and go from the office." Eisenberg should have consulted these records before responding negatively to previous questions about whether Mr. X returned to work at the firm after he was terminated in March 2006.
See https://compendium.wicourts.gov/app/raw/002479 .html.
¶ 134. These three bland paragraphs should be compared to the extensive negative discussion of Attorney Riley in the lead opinion.
¶ 135. As for Brian Polk (a/k/a "Mr. X"), he was not readmitted to the bar. He did not appeal the referee's ruling not to reinstate him and — to the best of my knowledge — he has not reapplied. But OLR never went after Polk for practicing law without a license or lying to a referee. Consequently, there is no OLR "discipline" on his record.
HH I — I
¶ 136. Attorney Riley was charged with violating three Supreme Court rules: former SCR 20:3.3(a)(4); current SCR 20:3.4(b); and current SCR 20:8.4(c). The text of the rules is significant.
¶ 137. In 2006 SCR 20:3.3(a)(4) read:
A lawyer shall not knowingly:
[[Image here]]
(4) offer evidence that the lawyer knows to be false. If a lawyer has offered material evidence and *371 comes to know of its falsity, the lawyer shall take reasonable remedial measures.
(Emphasis added.)
¶ 138. SCR 20:3.4(b) reads:
A lawyer shall not:
[[Image here]]
(b) falsify evidence, counsel or assist a witness to testify falsely or offer an inducement to a witness that is prohibited by law.
¶ 139. SCR 20:8.4(c) reads:
It is professional misconduct for a lawyer to:
[[Image here]]
(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation.
¶ 140. OLR's complaint asserted:
By eliciting and allowing Polk's testimony at Polk's reinstatement hearing regarding Polk's work history during the suspension of Polk's license that omitted Polk's employment at Riley's law firm, Eisen-berg & Riley, S.C., when Riley knew of that employment at the time he elicited and allowed that testimony, and his failure to remedy that omission at any time thereafter, Riley violated former SCR 20:3.3(a)(4), SCR 20:3.4(b), and SCR 20:8.4(c).
¶ 141. Attorney Riley was put in a very difficult situation. He either knew the full story about Polk's employment at the time Polk testified, or he didn't. In either event, if he "offered" the information and if the information was "material" at the reinstatement hearing, the lead opinion asserts that he had a duty to take *372 "reasonable remedial measures." Arguably, if he did not "offer" the information or if the information was not "material," he did not have a duty to take "reasonable remedial measures."
¶ 142. Assuming the existence of a duty, reasonable remedial measures could be interpreted to mean informing the referee that Polk's testimony was false, which would have had consequences. First, it would have destroyed any chance that Polk would win readmission to the bar. Second, it would almost certainly lead to OLR prosecution of Riley's boss, Alvin Eisen-berg. Third, it could seriously affect Riley's relationship with Eisenberg and the law firm, leading to Riley's possible resignation or termination.[1] Fourth, it could damage the law firm. Fifth, it could lead to a suit that Attorney Riley had breached the attorney-client privilege to Polk's detriment. If Attorney Riley knew all the facts about Polk's employment, he may have calculated that he would inform the referee if the referee decided in favor of reinstatement. Of course, the referee decided against reinstatement. The lead opinion has no room for "no harm, no foul."
¶ 143. It may well be that the legal profession must set high standards of candor and integrity, regardless of the cost to an individual attorney. But shouldn't the court at least acknowledge the heavy stakes in this case and the potential heavy stakes in future cases that will be affected by this decision?
¶ 144. To illustrate, the rules cited do not exempt attorneys who practice criminal law. What are the practical effects of this case on criminal defense attorneys? What are "reasonable remedial" steps for a *373 criminal defense attorney who knows or learns after his client has testified that his client has lied? I do not sense that the court's decision permits attorneys to look the other way when they know their client has testified falsely or omitted "important facts," even in a criminal case. Clearly, the court does not believe it was enough for Attorney Riley to withdraw as counsel after the hearing, as he did.
¶ 145. Inasmuch as the referee found that Attorney Riley knew about Polk's employment with Eisen-berg at the time of the reinstatement hearing, it may seem unnecessary to discuss what should have happened if he didn't know until later. Notably, however, the court dismisses the alleged violation of SCR 20:3.4(b) of having assisted a witness to testify falsely: A lawyer "shall not. . . counsel or assist a witness to testify falsely . . . ."
¶ 146. The court says:
We agree with Attorney Riley that the language of the rule ("counsel or assist a witness") indicates that some action by the lawyer prior to or at the time of the witness's false testimony is required. . .. We believe that SCR 20:3.4(b) should not be interpreted to reach the conduct that is shown on this record. There was no evidence in the summary judgment [record] ... that Attorney Riley advised Attorney Polk not to mention his work at the new Eisenberg firm, planned a way in which Attorney Polk could omit that information in his testimony... , or even knew that Attorney Polk intended to provide a list of his employers during his suspension that would omit the new Eisenberg firm... . [T]here is no indication.. . that the two of them took the step of discussing how Attorney Polk should address that concern in his reinstatement hearing testimony. Indeed, Attorney Polk testified that *374 he and Attorney Riley never had a preparation session to discuss his upcoming testimony at the reinstatement hearing.
Lead op., ¶¶ 69-70.
¶ 147. Nonetheless, the referee found that "Attorney Riley and Brian Polk spoke about [Polk's] law firm employment during 2006 when [Riley] was serving as counsel for Brian Polk."
¶ 148. Asking questions at the hearing about Polk's employment history could be viewed as "assisting" a witness to testify falsely. The court declines to take that position. On the other hand, the referee insisted that Attorney Riley knowingly "offered" evidence that he knew to be false. The distinction between knowingly "offering" evidence but not "assisting" is not clear to me in this case.
¶ 149. If Attorney Riley reasonably believed he did not assist Polk in giving false testimony, it is difficult to understand why he could not reasonably believe that he did not knowingly offer false evidence at the hearing.
¶ 150. Ethics scholars might wish to compare the word "offer" in former SCR 20:3.3(a)(4) with the word "offer" in SCR 20:3.4(b). How does an attorney "offer an inducement to a witness" if he never mentions an inducement?
¶ 151. There is another problem inherent in the former rule. It reads in essence that a lawyer shall not knowingly "offer evidence" that the lawyer knows to be false. But then, in the second sentence, the rule provides, "If a lawyer has offered material evidence and comes to know of its falsity, the lawyer shall take reasonable remedial measures." (Emphasis added.) The second sentence establishes a duty to remediate *375 any "material evidence" that is false, irrespective of prior knowledge, but it does not appear to require remediation of false evidence if the false evidence is not "material."
¶ 152. "Knowingly offer" and "material evidence" thus are terms that raise serious issues for an attorney in ambiguous situations.
¶ 153. These concerns go beyond the question of how to discharge an attorney's clear duty to the more fundamental question of whether this attorney had a duty.
I — I I — I
¶ 154. My other concern relates to the tension between an attorney's duties to his client and his duties to the court.
¶ 155. Wisconsin Stat. § 905.03(2), entitled "GENERAL RULE OF PRIVILEGE," reads:
A client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client: between the client or the client's representative and the client's lawyer or the lawyer's representative; or between the client's lawyer and the lawyer's representative; or by the client or the client's lawyer to a lawyer representing another in a matter of common interest; or between representatives of the client or between the client and a representative of the client; or between lawyers representing the client.
¶ 156. There are exceptions to this statute in subsection (4). It would have been useful for the court to discuss the applicable exceptions, if any, in this case.
*376 ¶ 157. The same is true with respect to SCR 20:1.6 related to confidentiality: "(a) Alawyer shall not reveal information relating to the representation of a client unless the client gives informed consent, except for disclosures that are impliedly authorized in order to carry out the representation, and except as stated in paras, (b) and (c)." (Emphasis added.) What are the applicable exceptions to this rule for Attorney Riley?
¶ 158. SCR 20:3.3, Candor toward the tribunal, reads in part: "A lawyer shall not knowingly: (1) make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer." This rule about false statements "by the lawyer" strikes me as much clearer and much easier to apply than former SCR 20:3.3(a)(4).
IV
¶ 159. To me the lead opinion raises sufficient questions about its impact on the law and its fairness to the respondent that I feel bound to respectfully dissent. It should be noted that the court has not been able to muster a majority of justices for the lead opinion. It should also be noted that the rule of lenity seems to be missing from the Rules of Professional Conduct for Attorneys.

 OLR's reference to "Riley's law firm" is a bit of an exaggeration.