# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE No.: | 2010AP2942-D |
| COMPLETE TITLE: | In the Matter of Disciplinary Proceedings Against John Kenyatta Riley, Attorney at Law: |

Office of Lawyer Regulation,
             Complainant-Respondent,
       v.
John Kenyatta Riley,
             Respondent-Appellant.

DISCIPLINARY PROCEEDINGS AGAINST RILEY

| | |
|---|---|
| OPINION FILED: | July 15, 2016 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | October 23, 2012 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | |
| COUNTY: | |
| JUDGE: | |

| | |
|---|---|
| JUSTICES: | |
| CONCURRED: | Abrahamson, J. and Bradley, A.W., J. (Part I of concurrence only) |
| DISSENTED: | Prosser, J. |
| NOT PARTICIPATING: | Bradley, R.G., J. |

ATTORNEYS:

For the respondent-appellant, there were briefs filed by *Stacie H. Rosenzweig*, *Halling & Cayo,* Milwaukee and *Paul R. Erickson*, *Gutglass, Erickson, Bonville & Larson, SC*, Milwaukee. Oral argument by *Paul R. Erickson*.

For the Office of Lawyer Regulation, there was a brief filed by *Matthew J. Price*, *Foley & Lardner, LLP*, Milwaukee and oral argument by *Matthew J. Price*.

**2016 WI 70**

No.   2010AP2942-D

STATE OF WISCONSIN        :        IN SUPREME COURT

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

**In the Matter of Disciplinary Proceedings Against John Kenyatta Riley, Attorney at Law:**

**Office of Lawyer Regulation,**

          **Complainant-Respondent,**

     **v.**

**John Kenyatta Riley,**

          **Respondent-Appellant.**

**FILED**

JUL 15, 2016

Diane M. Fremgen
Clerk of Supreme Court

ATTORNEY disciplinary proceeding. *Attorney publicly reprimanded.*

¶1   ROGGENSACK, C.J., ZIEGLER, J., AND GABLEMAN, J. Attorney John Kenyatta Riley appeals from the report of the referee, Attorney Hannah C. Dugan, who concluded that Attorney Riley had violated three Rules of Professional Conduct for Attorneys and recommended that he be publicly reprimanded and that he be required to pay the full costs of this disciplinary proceeding.

¶2 After our careful review of this matter and the legal issues it presents, a majority of the court has agreed that Attorney Riley committed professional misconduct, that he should be publicly reprimanded, and that he should be required to pay the full costs of this disciplinary proceeding, which were $16,961.70 as of November 6, 2012. This is, therefore, the mandate of the court. A majority of the court, however, does not agree as to a single rationale for reaching that result. Three justices, Chief Justice Roggensack, Justice Ziegler, and Justice Gableman, agree with the reasoning set forth in this lead opinion. Justice Abrahamson and Justice Ann Walsh Bradley concur in the mandate, but do not join this opinion.[1] Each of them sets forth her views in a concurring opinion. Justice Prosser dissents.[2]

## I. FACTUAL AND PROCEDURAL BACKGROUND

¶3 Attorney Riley was admitted to the practice of law in Wisconsin in May 1996. He has been the subject of professional discipline on one prior occasion. In 2009 Attorney Riley consented to the imposition of a private reprimand for violating SCRs 20:1.3 (lack of diligence) and 20:1.4(b) (failure to

---

[1] The mandate that follows this lead opinion is the mandate of the court as agreed upon by all of the participating justices except Justice Prosser.

[2] Justice N. Patrick Crooks participated in the oral argument of this matter, but he passed away while the matter was pending. Justice Rebecca G. Bradley did not participate in this matter.

2

explain a legal matter to a client). He currently practices in Milwaukee with the law firm of Eisenberg, Riley and Zimmerman, S.C.

¶4 This case involves the intersection of the careers of two attorneys, Attorney Riley and Attorney Brian K. Polk. An understanding of Attorney Polk's employment history is necessary to an understanding of the charges of professional misconduct against Attorney Riley.

A. Attorney Polk's Employment History and Reinstatement

Proceeding

¶5 From July 1997 until June 2000, Attorney Polk worked as an associate attorney for the law firm of Eisenberg, Weigel, Carlson, Blau, Reitz & Clemens, S.C. (Eisenberg, Weigel)[3] doing "intake" work for personal injury cases. He ended his employment with that firm because he claims he became disillusioned with the lack of opportunities to do more substantive legal work. After leaving the Eisenberg, Weigel firm, Attorney Polk was unemployed for a while and failed to comply with his continuing legal education (CLE) reporting requirement. His license was administratively suspended for that reason in June 2001.

¶6 Over the next several years, Attorney Polk held a number of different non-legal jobs. Although his license to practice law in Wisconsin remained administratively suspended,

---

[3] One of the named partners of the Eisenberg, Weigel firm was Attorney Alvin H. Eisenberg.

at some point in the fall of 2005 Attorney Polk began to work for a new law firm[4] that Attorney Alvin Eisenberg had founded after the breakup of the Eisenberg, Weigel firm.[5] Attorney Polk was made part of the personal injury "team" that was led by Attorney Eisenberg. He solicited individuals to become personal injury clients of the firm, he met with and gave legal advice to clients about their claims, he did property damage settlements, and he corresponded with third parties using firm letterhead and identifying himself in the signature block as an "attorney at law." During the time that Attorney Polk worked for the new Eisenberg firm, he spent approximately 50 hours per week or more in the firm's offices. Attorney Polk was given his own office and telephone extension, and his extension was listed on the firm's telephone extension list. Because the firm was reluctant to use Attorney Polk's real name over its intercom system, for a

---

[4] The initial name of the new firm founded by Attorney Eisenberg is not clear from the record of this matter. Thus, for purposes of this opinion, the firm will be referenced as "the new Eisenberg firm." At some point after Attorney Riley joined the new Eisenberg firm, the name of the firm was changed to Eisenberg & Riley. The record does not disclose exactly when this occurred, but it apparently occurred prior to September 6, 2006, the date of the hearing that is at issue in this matter, because Attorney Riley identified himself at that hearing as "Attorney Kenyatta Riley [of] the Law Offices of Eisenberg and Riley."

[5] There were ongoing disputes, civil actions and attorney regulatory complaints between Attorney Eisenberg and Attorney Joseph Weigel in connection with the breakup of the Eisenberg, Weigel firm. See In re Disciplinary Proceedings Against Weigel, 2012 WI 124, 345 Wis. 2d 7, 823 N.W.2d 798, cert. denied, ___U.S.___, 135 S. Ct. 375 (2014).

while the firm used the pseudonym "James Pearson" for Attorney Polk when paging him over the firm's intercom system.  Attorney Polk testified in this proceeding that he stopped working for the new Eisenberg firm in the first half of 2006.[6]

¶7   Attorney Riley was familiar with Attorney Polk because Attorney Riley also had been an associate attorney at the Eisenberg, Weigel firm during the same time period as Attorney Polk.  Attorney Riley moved to a different law firm and then opened his own solo practice.  It appears that Attorney Riley also began working as an associate attorney at the new Eisenberg firm in the middle part of 2005, shortly before Attorney Polk began his employment with that firm.  During the time when Attorney Polk was also employed by the new Eisenberg firm, Attorney Riley did not have any management responsibilities in that firm.  At a later date, he did begin to take on management responsibilities.

¶8   In February 2006, while Attorney Polk was still working as an attorney at the new Eisenberg firm, he filed a petition for the reinstatement of his license to practice law in this state.  After conducting an investigation, the Office of Lawyer Regulation (OLR) filed a response opposing the

---

[6] Attorney Eisenberg received a consensual public reprimand in connection with hiring Attorney Polk to engage in law-related work and allowing him to hold himself out as an attorney while his license to practice law was administratively suspended. Public Reprimand of Alvin H. Eisenberg, No. 2012-8 (electronic copy available at https://compendium.wicourts.gov/app/raw/002479.html).

reinstatement petition due to a number of concerns about Attorney Polk's character and fitness to practice law, including his receipt of a citation for loitering-illegal drug activity, his multiple citations and convictions for operating after revocation of his driver's license and for other traffic offenses, and his failure to pay multiple civil judgments. The OLR's response did not mention any concerns regarding Attorney Polk's employment history or his unauthorized practice of law during his administrative suspension, presumably because it was not aware of Attorney Polk's employment at the new Eisenberg firm.

¶9 Because there appeared to be a number of disputed factual issues regarding the concerns raised by the OLR, on June 23, 2006, this court referred the matter to a referee, Reserve Judge Dennis Flynn, to receive evidence and make factual determinations regarding (1) the number and type of citations/convictions that Attorney Polk had received in connection with his operation of a motor vehicle, (2) the facts surrounding the incident for which Attorney Polk had received the citation for loitering-illegal drug activity and whether he had misrepresented those facts to the OLR in its investigation, and (3) the facts concerning the nature and status of the outstanding civil judgments against Attorney Polk. The court's order further provided that the referee "may also consider any other matter that the referee deems helpful to this court's decision of the reinstatement petition."

¶10 Attorney Riley did not have any role in the preparation or filing of Attorney Polk's reinstatement petition. Attorney Polk represented himself during most of the reinstatement proceeding. Prior to the evidentiary hearing scheduled by Judge Flynn, however, Attorney Polk spoke with Attorney Eisenberg about concerns he had with the upcoming hearing. Attorney Eisenberg then spoke with Attorney Riley and directed him to assist Attorney Polk with the reinstatement hearing. The initial understanding among the three lawyers was that Attorney Riley would act as "second chair" for the hearing, meaning that Attorney Polk would still be primarily responsible for presenting evidence, examining witnesses, and making argument.

¶11 According to Attorney Riley, prior to the hearing he did not draft any legal documents and did not solicit witnesses to testify on Attorney Polk's behalf or prepare any witnesses to testify. The referee found, however, that prior to the hearing, Attorney Polk had specifically discussed with Attorney Riley that Attorney Polk was concerned about not having disclosed his employment with the new Eisenberg firm to the OLR in the reinstatement investigation.

¶12 The evidentiary hearing before Judge Flynn took place on September 6, 2006. Despite the initial understanding that Attorney Riley would act as only a "second chair," he took the lead role in presenting Attorney Polk's case at the hearing. He handled the direct and cross-examination of all witnesses, made

7

and responded to objections, argued legal issues, and presented closing argument in favor of Attorney Polk's reinstatement.

¶13 Some understanding of the flow of the hearing is necessary to understand the charges against Attorney Riley and his arguments against those charges. Although Attorney Polk, as the petitioner for reinstatement, bore the burden of proof, the parties and the referee agreed to hear first the testimony of a police officer who had been involved in issuing the citation for loitering-illegal drug activity to Attorney Polk so that the officer would not need to wait through other testimony and could return to his police duties. The OLR's attorney conducted the direct examination of the officer, and Attorney Riley cross-examined the officer on behalf of Attorney Polk.

¶14 After the completion of the officer's testimony, the hearing returned to the standard procedure, and Attorney Riley proceeded to present evidence on Attorney Polk's behalf. The first witness he called was Attorney Polk. Presumably because the referee had just heard the testimony of the police officer regarding the events that led to the issuance of the citation for loitering-illegal drug activity, Attorney Riley began Attorney Polk's direct examination not with the normal background questions, but rather with a substantial number of substantive questions regarding those same events. Attorney Riley's questions and Attorney Polk's responses on this subject occupied approximately ten pages of the hearing transcript.

¶15 The next topic on which Attorney Riley questioned Attorney Polk was the various traffic citations he had received,

8

including the multiple offenses for having driven with a suspended or revoked driver's license. This also was a substantial discussion, occupying approximately 12 pages of transcript.

¶16 Attorney Riley then turned the questioning to the topic of the civil judgments that had been entered against Attorney Polk. After eliciting some information about the status of those judgments, Attorney Riley asked Attorney Polk a series of questions regarding his ability or inability to have satisfied those judgments over the preceding years. Attorney Polk testified generally that during the period of the suspension of his law license, the jobs he had held were non-professional jobs with limited rates of compensation. Attorney Polk further testified that he had used the money he had earned to provide for his family rather than to satisfy the judgments that had been entered against him. Attorney Riley asked two more questions that were clearly intended to allow Attorney Polk to repeat and emphasize that his lack of income had been the reason for not paying the judgments. It was after these two questions that Attorney Riley asked Attorney Polk to summarize his employment history in the following exchange, which is the basis for the charges in this disciplinary proceeding:

    Q. And I know you touched on it earlier, but can you tell the Court what kind of jobs you've had since the loss of your [law] license. What have you done?

    A. Worked as——worked for 7-Up Bottling loading trucks, riding a forklift. Worked at a video distribution center, doing everything from

> sweeping the floors to loading trucks. At one point in time, for a period of time, I worked for Progressive Training Consultants. During that period I did some consulting work on the Marquette Interchange. But for the most part, I've had labor related, you know, jobs, warehouse type of work.

¶17 Importantly, Attorney Polk's answer did not make any mention of his employment with the new Eisenberg firm. Attorney Riley did not ask any follow-up questions to bring out that fact or to clarify that Attorney Polk's answer was not complete. Attorney Riley stayed with the same subject matter regarding the unpaid judgments, but he moved on to asking about specific judgments and whether they had been satisfied.

¶18 On cross-examination, the OLR's counsel asked Attorney Polk a lengthy series of questions concerning whether during the suspension of his license to practice law (1) he had attempted to practice law, (2) he had held himself out as an attorney, (3) he had provided legal advice to anyone, (4) he had done any legal research, or (5) he had engaged in any "law work activity" or "any work normally performed by clerks or paralegal personnel." Attorney Polk responded negatively to each of these questions. He again did not mention his work for the new Eisenberg firm.

¶19 Attorney Riley's redirect examination of Attorney Polk did not did not include any questions regarding Attorney Polk's employment history. It focused solely on why Attorney Polk had not contested the loitering citation.

¶20 Following the hearing, Judge Flynn issued a report and recommendation, as requested in this court's June 23, 2006

10

order. Because Attorney Polk did not disclose his employment with the new Eisenberg firm, Judge Flynn's report did not discuss the impact of Attorney Polk's work on legal matters while suspended on his suitability for reinstatement. Judge Flynn, however, did comment in several parts of his report on Attorney Polk's employment history generally when discussing Attorney Polk's claim that he lacked funds to satisfy the judgments that had been entered against him. Specifically, Judge Flynn stated that, given Attorney Polk's testimony at the hearing, the jobs he had held during his suspension "had been for low wages" and that Attorney Polk had used the money he had earned to support his family. In addition, Judge Flynn accepted Attorney Polk's testimony that he had not been employed or sought employment for the last six months because he had been waiting for his license to practice law to be reinstated. Although the referee generally accepted Attorney Polk's testimony regarding his employment history and the low wages he had earned, the referee nonetheless rejected Attorney Polk's claim that he had been financially unable either to pay the debts in full or to work out a payment plan. The referee's findings and comments regarding Attorney Polk's job history and ability to make payments demonstrate that these subjects were a relevant factor in the referee's ultimate legal conclusion that Attorney Polk did not have a proper understanding of and attitude toward the standards that are imposed upon Wisconsin attorneys.

11

¶21 Ultimately, given the referee's findings, this court denied Attorney Polk's reinstatement petition. <u>In re Reinstatement of Polk</u>, 2007 WI 51, 300 Wis. 2d 280, 732 N.W.2d 419.

B. Procedural History of Current Disciplinary Proceeding Against Attorney Riley

¶22 In the course of an investigation in 2008, the OLR learned that Attorney Polk had been employed by the new Eisenberg firm in 2005-06 while Attorney Riley had also worked there. When the OLR asked Attorney Riley about that fact, he indicated that he had not known that. Attorney Riley claims that he then investigated whether Attorney Polk had been employed by the new Eisenberg firm. Although he asserts that this was the first time he learned of Attorney Polk's work at the law firm, he never advised the OLR, Judge Flynn, or this court at that time that Attorney Polk's testimony at the September 6, 2006 hearing had been false or misleading because of the omission of his employment at the new Eisenberg firm.

¶23 The OLR subsequently filed a formal complaint against Attorney Riley regarding his actions in representing Attorney Polk at the September 6, 2006 evidentiary hearing. Although the complaint was framed as a single count, it alleged that Attorney Riley's actions at the hearing and thereafter had violated three separate Rules of Professional Conduct for Attorneys. First, it

alleged that Attorney Riley had violated former SCR 20:3.3(a)(4)[7] by offering material evidence that he knew to be false and failing to take reasonable remedial measures. Second, it accused Attorney Riley of violating SCR 20:3.4(b)[8] by either falsifying evidence or counseling or assisting a witness to testify falsely. Third, it alleged that Attorney Riley's questioning of Attorney Polk and his failure to disclose Attorney Polk's omission of his employment at the new Eisenberg firm from his response regarding his employment history had constituted conduct involving dishonesty, fraud, deceit or misrepresentation, in violation of SCR 20:8.4(c).[9]

¶24 As noted above, Attorney Hannah Dugan was appointed as referee. After the OLR took depositions of Attorney Riley and Attorney Polk, Attorney Riley filed a motion for summary judgment. He argued that he could not have violated the three identified rules because he had no knowledge of Attorney Polk's employment at the new Eisenberg firm until the OLR notified him

---

[7] Former SCR 20:3.3(a)(4) (effective through June 30, 2007) provided that a lawyer shall not knowingly "offer evidence that the lawyer knows to be false. If a lawyer has offered material evidence and comes to know of its falsity, the lawyer shall take reasonable remedial measures."

[8] SCR 20:3.4(b) states that a lawyer shall not "falsify evidence, counsel or assist a witness to testify falsely, or offer an inducement to a witness that is prohibited by law; . . . ."

[9] SCR 20:8.4(c) states it is professional misconduct for a lawyer to "engage in conduct involving dishonesty, fraud, deceit or misrepresentation; . . . ."

of that fact in 2008 and because Attorney Polk's testimony about his employment was not material to the reinstatement proceeding before Judge Flynn.

¶25 Referee Dugan denied Attorney Riley's summary judgment motion. She concluded that there was a genuine dispute of material fact regarding whether Attorney Riley had known about Attorney Polk's employment at the new Eisenberg firm and had failed to remedy Attorney Polk's false testimony. Given the presence of a dispute of material fact, the referee indicated at that stage in the proceeding she did not believe that whether there was a genuine issue of material fact regarding Attorney Polk's employment in the Polk reinstatement proceeding was relevant to whether there was a genuine issue of material fact in the current disciplinary proceeding against Attorney Riley.

¶26 After the summary judgment motion was denied, the parties proceeded to a full evidentiary hearing. The primary focus of that hearing was whether Attorney Riley had known at the time of the September 6, 2006 hearing that Attorney Polk had been employed by and had performed law-related work for the new Eisenberg firm, which would have determined whether he knew of the falsity of Attorney Polk's testimony.

¶27 Attorney Riley denied that he had been aware that Attorney Polk had been employed by the new Eisenberg firm in late 2005 and early 2006. He acknowledged that he had seen Attorney Polk in the firm's offices in that timeframe, but claimed he had believed that Attorney Polk was merely a guest using the firm's resources either to work on his petition for

14

reinstatement or to do his own consulting work. Attorney Riley explained that the environment at the new Eisenberg firm at that time was "free-wheeling," with numerous people coming and going through the firm's offices.

## C. Referee's Report and Recommendation

¶28 The referee did not accept Attorney Riley's denials. In her report the referee pointed out that multiple witnesses had testified that during the relevant months of 2005-2006, Attorney Polk had been at the offices of the new Eisenberg firm for many hours each week, that he had attended regular firm meetings of the personal injury team, that Attorney Riley had seen him at those meetings, that Attorney Polk had met with clients and had performed other normal law-office activities, and that the offices of Attorney Riley and Attorney Polk at the law firm were in close proximity. While stating that in light of this evidence it would seem incredible for Attorney Riley not to have known of Attorney Polk's employment and practice of law with the new Eisenberg firm, the referee nonetheless believed that this evidence, by itself, was not sufficient to constitute the required clear, satisfactory, and convincing evidence the OLR needed to meet its burden of proof that Attorney Riley knew Attorney Polk's response at the hearing was false by omission.[10]

---

[10] In an attorney disciplinary proceeding, the OLR must prove any violation of the Rules of Professional Conduct for Attorneys by clear, satisfactory, and convincing evidence. SCR 22.16(5).

15

¶29 The referee also found Attorney Riley's claims that he had agreed to act only as a second chair and that he had not prepared for the September 6, 2006 hearing were not as credible as Attorney Polk's testimony. In particular, the referee credited Attorney Polk's statement that prior to the September 6, 2006 hearing, he had specifically discussed with Attorney Riley his concern that he had not disclosed his employment with the new Eisenberg firm.[11] The referee stated that Attorney Riley had never directly refuted this statement in his testimony at the hearing. Consequently, the referee further found that Attorney Riley had known that Attorney Polk's failure to disclose his employment with the new Eisenberg firm in his answer to Attorney Riley's question at the September 6, 2006 hearing had made Attorney Polk's testimony false by omission.

¶30 The referee next addressed Attorney Riley's argument that Attorney Polk's testimony about his employment history was not material to the issues in Attorney Polk's reinstatement proceeding.

¶31 The referee believed that this court's June 23, 2006 order had created a "hybrid" standard for obtaining reinstatement after a more-than-three-year administrative suspension. She was unsure whether Attorney Polk's employment

---

[11] The referee included the following statement in her report: "Brian Polk's statements that prior to the [reinstatement] hearing that he raised with Attorney Riley concerns about not disclosing that he was working at the [new Eisenberg] firm are forthright, clear and convincing."

16

history would have been material under only this court's reinstatement rules for administrative suspensions and this "hybrid" standard.

¶32 She therefore turned to whether the information about Attorney Polk's employment at the new Eisenberg firm had been material to the issues identified in this court's June 23, 2006 order. The referee did not expressly conclude whether Attorney Polk's employment history was material to the three specific subjects set forth in that order (i.e., loitering citation, traffic violations, and unpaid civil judgments). She concluded, however, that his law firm employment had been material to Judge Flynn's analysis of the "catch-all" provision in the order ("any other matter that the referee deems helpful to this court's decision of the reinstatement petition"). Specifically, although the June 23, 2006 order did not expressly direct Judge Flynn to make findings regarding Attorney Polk's employment history during his suspension, Referee Dugan believed that information about Attorney Polk's having engaged in law-related work for a law firm would have been material to the referee's determination of Attorney Polk's fitness to return to the practice of law.

¶33 The referee also discussed that there was no dispute that in 2008, after having been advised by the OLR that it had learned of Attorney Polk's employment at the new Eisenberg firm, Attorney Riley testified that he had conducted his own investigation and clearly knew at that point that Attorney Polk's testimony had been false by omission. The referee noted

17

that, despite being aware of this false testimony, Attorney Riley did not attempt to remedy the prior false evidence by advising Judge Flynn, the OLR, or this court.

¶34 Having found that Attorney Polk had given false testimony in response to Attorney Riley's question and that Attorney Riley was aware of the falsity, and having determined that Attorney Polk's testimony was material to Judge Flynn's task in Attorney Polk's reinstatement proceeding, Referee Dugan concluded that the OLR had met its burden of proof by clear, satisfactory, and convincing evidence on each of the three rule violations alleged in this case. First, the referee determined that Attorney Riley had offered false material evidence at the reinstatement hearing and, after having learned of the falsity, had failed to take reasonable remedial measures, in violation of former SCR 20:3.3(a)(4). Second, the referee concluded that Attorney Riley had violated SCR 20:3.4(b) by having assisted a witness to testify falsely. Third, the referee determined that Attorney Riley's involvement with Attorney Polk's false testimony constituted conduct involving dishonesty, fraud, deceit or misrepresentation, in violation of SCR 20:8.4(c).[12]

---

[12] The referee noted that this court has held that omissions that cause a statement to be false can constitute unethical conduct in violation of SCR 20:8.4(c). See, e.g., In re Disciplinary Proceedings Against Knickmeier, 2004 WI 115, 275 Wis. 2d 69, 683 N.W.2d 445, cert. denied, 544 U.S. 1041 (2005); In re Disciplinary Proceedings Against Urban, 2002 WI 63, 253 Wis. 2d 194, 645 N.W.2d 612.

¶35 Having found violations of all three rules as charged in the OLR's complaint, the referee recommended that the court publicly reprimand Attorney Riley, as requested by the OLR.

¶36 The referee relied on several cases cited by the OLR as support for a public reprimand. She asserted that some of those cases involved omissions by counsel that constituted false evidence in violation of SCR 20:3.3. See, e.g., In re Disciplinary Proceedings Against McNeely, 2008 WI 91, 313 Wis. 2d 283, 752 N.W.2d 857 (60-day suspension imposed for three ethical violations, including violations of SCRs 20:3.3(a)(1) and 20:8.4(c)); In re Disciplinary Proceedings Against Lister, 2007 WI 55, 300 Wis. 2d 326, 731 N.W.2d 254 (five-month suspension imposed for 17 proven counts of misconduct).[13] The referee also pointed to several cases in which attorneys had been disciplined for having made false statements to tribunals, in violation of SCRs 20:3.3 and/or 20:8.4(c). In re Disciplinary Proceedings Against Alia, 2006 WI 12, 288 Wis. 2d 299, 709 N.W.2d 399 (90-day suspension where attorney altered exhibit and used it to elicit false testimony at trial); In re Disciplinary Proceedings Against Kalal, 2002 WI 45, 252

---

[13] Although this court spoke of the fact in the Lister opinion that Attorney Lister had not indicated to the circuit court that he was unsure of a fact stated in an argument, that was not really an omission case because Attorney Lister made an affirmative representation to the circuit court that was simply contrary to fact. His statement was not false or misleading because of an omission of another fact. 300 Wis. 2d 326, ¶¶9, 64.

19

Wis. 2d 261, 643 N.W.2d 466 (attorney publicly reprimanded for making false statement during appellate oral argument); Public Reprimand of Holly L. Bunch, No. 2009-12 (consensual public reprimand imposed on prosecutor for misrepresenting to a jury that the defendant had never previously denied committing the crime when prosecutor knew of police reports that referenced such denials)(electronic copy available at https://compendium.wicourts.gov/app/raw/002196.html).

¶37 In addition, the referee noted two aggravating factors identified by the OLR: (1) Attorney Riley's refusal to acknowledge the wrongful nature of his conduct, and (2) his prior private reprimand for a lack of diligence and a failure to explain the legal options to clients. Although the OLR had asserted that there were no mitigating factors, the referee concluded that Attorney Riley's full cooperation with the OLR in the present disciplinary process should be acknowledged.

## II. ANALYSIS OF ATTORNEY RILEY'S APPEAL

### A. Appeal of Summary Judgment Denial

¶38 Attorney Riley appealed from both the referee's order denying his motion for summary judgment and the referee's final report and recommendation. He challenges a number of the referee's findings of fact and raises a host of arguments as to why he should not be found to have violated any of the three ethical rules cited in the OLR's complaint.

¶39 Several of the legal issues identified by Attorney Riley in connection with the summary judgment decision also

20

apply to the referee's final report. We will address them in this portion of our opinion.

¶40 The first subject we address is the standard by which we review the referee's denial of Attorney Riley's motion for summary judgment. The parties agree that the court should use the same methodology and standard for reviewing grants or denials of summary judgment as are used in civil actions. See Wis. Stat. § 802.08 (setting forth standard for granting a summary judgment motion); see, e.g., Beidel v. Sideline Software, Inc., 2013 WI 56, ¶33, 348 Wis. 2d 360, 842 N.W.2d 240 (appellate court reviewing civil cases applies same standard and methodology used by circuit court); Green Spring Farms v. Kersten, 136 Wis. 2d 304, 315, 401 N.W.2d 816 (1987).

¶41 The court has referenced motions for summary judgment and referee decisions on such motions in prior disciplinary cases and has implied that such decisions should be reviewed using the same standard applied by circuit courts and appellate courts in "normal" civil actions. See, e.g., In re Disciplinary Proceedings Against Humphrey, 2012 WI 32, ¶¶60-62, 339 Wis. 2d 531, 811 N.W.2d 363 (dismissing charge for which the referee granted the OLR summary judgment because the admitted allegations of the complaint were an insufficient basis to find a violation). We therefore will utilize that methodology and standard of review in reviewing the referee's summary judgment decision in this case.

¶42 Attorney Riley makes a number of arguments that challenge the legal sufficiency of the OLR's claims and the

21

referee's legal analysis of those claims. Two of his arguments are related and concern the materiality of Attorney Polk's testimony about his employment during his administrative suspension. Attorney Riley asserts that, regardless of whether Attorney Polk's answer about his employment was false and whether Attorney Riley knew of the falsity of that answer, there can be no violation of the three ethical rules cited by the OLR because Attorney Polk's statement was not material to the issues before Judge Flynn in the reinstatement proceeding, and only material falsehoods give rise to ethical violations.

¶43 Attorney Riley contends that because the rules regarding reinstatement petitions following administrative suspensions of more than three years do not require a description of the petitioning attorney's business activities during the suspension, such information was not required in Attorney Polk's reinstatement proceeding and the information he did provide about his employment was therefore not material or relevant to that proceeding.

¶44 Attorney Riley acknowledges, however, that this court in its June 23, 2006 order identified three subjects on which the referee was to receive evidence and about which he was to make factual findings: (1) the number and type of citations or convictions for motor vehicle offenses, (2) the facts surrounding the incident for which Attorney Polk received a citation for loitering-illegal drug activity, and (3) the facts concerning the nature and status of any outstanding civil judgments against Attorney Polk. Attorney Riley contends these

22

were the only matters at issue during the reinstatement hearing and that Attorney Polk's testimony regarding what jobs he had held during his administrative suspension was not material to any of these three subjects. He repeatedly describes Attorney Polk's employment testimony and the question he asked that elicited this testimony as merely "boilerplate" or "background," implying that it was mere context or pleasantry that had no effect on the substantive issues that Judge Flynn was to consider. According to Attorney Riley, since Attorney Polk's testimony about his employment was not material to the three subjects identified in our referral order, he had no duty under former SCR 20:3.3(a)(4) to remediate and cannot be found to have violated that rule.

¶45 To the extent the OLR argued before the referee that Attorney Polk's testimony was material because it fell under the "catch-all" language in the court's June 23, 2006 order,[14] Attorney Riley contends that relying on such a catch-all provision would have made everything Attorney Polk uttered material. He asserts that this would make him and all other Wisconsin attorneys liable for any false or misleading statement made by their clients at any stage in a lawsuit. He argues that a litigator would need to analyze every statement made by the litigator's client or witness in order to determine whether

---

[14] On appeal the OLR disclaimed any intention to use the catch-all provision in the court's June 23, 2006 order as the basis for the materiality of Attorney Polk's omission.

there was a potential discrepancy that needed to be remediated. Moreover, since the duty to remediate under former SCR 20:3.3(a)(4) did not terminate at the end of the case or representation, the lawyer would continue to have an obligation to explore facts and issues and potentially to notify the court long after the lawyer no longer represented the client. Moreover, he asserts that this ongoing duty would apply even when the client lost in the litigation and correcting the false or misleading statement could therefore have no potential impact on the case. He contends that this is an impossible standard for any litigator in this state to satisfy, and that nearly every litigator in practice in this state would have violated that standard at some point in his/her practice.

¶46 In a related vein, Attorney Riley criticizes Referee Dugan for stating that Judge Flynn and this court had created a "hybrid" reinstatement standard in the Polk reinstatement proceeding so that she could find Attorney Polk's testimony to

24

be material to that proceeding.[15] According to Attorney Riley, if this court did, in fact, create a "hybrid" standard in its subsequent decision denying Attorney Polk's petition, as Referee Dugan believes, he cannot be sanctioned for being ignorant of a materiality standard that had not been established at the time of the September 2006 hearing before Judge Flynn.

¶47 We conclude that the omitted information regarding Attorney Polk's employment with the new Eisenberg firm was material to the task this court gave to Judge Flynn and to this court's consideration of Attorney Polk's reinstatement petition.

---

[15] Referee Dugan believed that there was a gap in this court's rules regarding what standard to apply to a reinstatement petition following an administrative suspension of more than three years. She indicated that it was not initially clear in the Polk reinstatement matter whether to apply the standards that govern reinstatement petitions following a disciplinary suspension of more than six months, see SCRs 22.29-22.33, or the standards that govern reinstatement petitions following an administrative suspension of less than three years, see, e.g., SCR 31.11(1). In a formal reinstatement proceeding following a disciplinary suspension of more than six months, the lawyer's employment during his/her suspension is explicitly a matter of concern. See SCR 22.29(4)(k) (petition for reinstatement shall contain "[a] full description of all the petitioner's business activities during the period of suspension or revocation"). A description of the petitioner's business activities, however, is not explicitly mentioned in the rules that relate to reinstatement from an administrative suspension, whether the suspension is less than or more than three years in duration. She believes that since this court ultimately indicated that an attorney seeking reinstatement from an administrative suspension of more than three years must demonstrate good moral character and fitness to practice law, this court created a "hybrid" standard, which made evidence regarding his employment activities during the period of suspension material to his fitness to resume the practice of law.

25

We do not, however, base this determination on a belief that every subject was material under the catch-all provision in our June 23, 2006 order. We agree with Attorney Riley that the rules of professional conduct do not make an attorney a guarantor of the accuracy of each statement in a client's testimony, nor do we believe that the rules require an attorney to interrupt depositions or court hearings repeatedly if the attorney thinks there might be some trivial discrepancy between what a witness said under oath and what the attorney understood to be the truth. We also do not find this omitted information to be material only because Attorney Polk subsequently admitted years later that he had practiced law at the new Eisenberg firm. In other words, it is not necessary that Attorney Riley knew that Attorney Polk was practicing law (as opposed to simply working) at the new Eisenberg firm, in order for Attorney Riley to have violated former SCR 20:3.3(a)(4).

¶48 Our determination that the omitted information was material rests on the language of the order we issued to Judge Flynn. One of the topics on which Judge Flynn was to receive testimony and for which he was to make recommendations to this court was Attorney Polk's nonpayment of a number of civil judgments. Judge Flynn was to determine the status of those judgments. This obviously included why a number of those judgments had not been satisfied and were still outstanding.

¶49 Attorney Polk's defense on this issue was that the judgments had not been paid due to his lack of financial resources. Whether he had been employed and what types of jobs

26

he had held during the period of his administrative suspension (whether minimum-wage, menial positions or higher-wage, professional positions) were therefore matters of central importance to the task given to Judge Flynn. If Attorney Polk had been able to obtain only minimum wage or part-time jobs, that fact would have bolstered his argument that he had been financially unable to pay his legal debts. On the other hand, if he had held a position with a law firm, even a non-attorney position, that would have implied that he was earning a somewhat higher wage and could have made at least some payments of some amount toward his past debts. A deliberate choice not to pay one's legal obligations reflects far differently on one's respect for the law and the legal system than a financial inability to pay one's debts.

¶50 Attorney Riley's own questioning of Attorney Polk at the September 2006 hearing and his closing argument at the end of that hearing demonstrate the materiality of Attorney Polk's employment to one of the subjects that Judge Flynn was to consider.

¶51 First, to the extent that Attorney Riley characterizes Attorney Polk's testimony regarding the jobs he held as merely "background" information in response to a "boilerplate" question, the transcript of the reinstatement hearing undercuts this characterization. As described above, Attorney Riley did not begin his direct examination of Attorney Polk by asking a series of general background questions regarding Attorney Polk's address, education, employment history, etc. Rather, he

27

immediately proceeded to a series of substantive questions regarding the circumstances surrounding Attorney Polk's receipt of the citation for loitering-illegal drug activity and his multiple violations of the traffic laws. Only after exhausting his questioning on those two substantive topics, which take up approximately 22 pages of transcript, did Attorney Riley ask a series of questions that were clearly designed to allow Attorney Polk to testify that he could not have paid the several civil judgments that remained outstanding because the types of non-legal jobs he had taken during his suspension had provided insufficient income to cover his family's living expenses. The question from Attorney Riley that elicited Attorney Polk's false response was a part of that series of questions regarding the reasons why the judgments had remained unsatisfied. Moreover, it was not even the first question in that series. The question therefore was clearly not a boilerplate question that lawyers often ask merely to make a witness comfortable and to provide some general background at the start of a witness's testimony. It was a substantive part of an intentionally crafted presentation to explain Attorney Polk's nonpayment of the multiple civil judgments against him.

¶52 Further, asking this question was not the only time that Attorney Riley brought Attorney Polk's employment history to the referee's attention. Indeed, in his closing argument at the hearing, Attorney Riley argued that Attorney Polk had always intended to pay off all of the outstanding judgments, but that

28

he had been unable to do so because of the type of jobs he had been able to find.[16]

¶53 Because we determine that the omission of any mention of having worked for the new Eisenberg firm in Attorney Polk's testimony regarding his employment was material to his ability to pay the civil judgments that were outstanding against him, we need not address whether there is a difference under the rules of professional conduct regarding the scope of permissible work for an attorney subject to a disciplinary suspension versus an attorney subject only to an administrative suspension. We also do not need to address the referee's contention that the court created a "hybrid" standard for obtaining reinstatement after lengthy administrative suspensions or Attorney Riley's criticism of the idea of a hybrid standard. Contrary to Attorney Riley's claim, Attorney Polk's false testimony did not become material only because of this court's subsequent decision denying Attorney Polk's reinstatement petition; it was material from the beginning.

---

[16] Attorney Riley's closing argument included the following explicit reference to Attorney Polk's inability to pay the judgments because of the low-paying jobs he had taken during his suspension:

> It has been his intent, even from the Ford satisfaction, to get these judgments paid off. He has the mindset that he wants to work out payment arrangements with them. But so far, it's just been difficult for him because of his employment type situation.

¶54 Moreover, the fact that this court ultimately denied Attorney Polk's petition does not erase the materiality of the testimony. A false statement made to influence a tribunal does not become less false or less harmful to the adjudicative process because the tribunal ultimately decides against the person giving the false testimony on other grounds. See Douglas R. Richmond, Brian S. Faughnan, and Michael L. Matula, Professional Responsibility in Litigation 523 (2011) ("A lawyer may be found to have violated either rule [current ABA Model Rule 3.3 or 3.4(b)] even where the false testimony did not affect the outcome of the proceedings."). It is not acceptable to lie to a court or to a referee if your lie does not cause you to win.

¶55 Attorney Riley makes another legal argument about the scope of former SCR 20:3.3(a)(4), although he frames it as a factual argument. Specifically, he asserts that he did not "offer" false evidence to the referee because he simply asked what he calls "an open-ended question about [Attorney Polk's] employment," to which Attorney Polk gave a "narrative" description of his jobs. Attorney Riley implies that there can be a violation of former SCR 20:3.3(a)(4) only if an attorney actively elicits false testimony, for example, by asking a witness leading questions designed to lead the witness to present the false statement. He offers no legal authority for this position, other than that the rule speaks in terms of "offering" false evidence.

¶56 We acknowledge that the term "offer" in former SCR 20:3.3(a)(4) has not been interpreted in prior Wisconsin disciplinary decisions. Indeed, it does not appear that the term "offer" in the 1983 version of the American Bar Association's (ABA) Model Rules of Professional Responsibility, on which former SCR 20:3.3(a)(4) was based, has been the explicit focus of a disciplinary decision in other jurisdictions.

¶57 It is equally true, however, that the comments to the rule and court decisions from other states have provided notice that a lawyer has a duty to remediate false testimony given by a client, regardless of the manner in which the false testimony was given. The ABA comment to 1983 Model Rule 3.3 states that a lawyer must take remedial measures "[w]hen false evidence is offered by the client." ABA Model Rules of Prof'l Conduct R. 33 cmt. (1983).

¶58 We conclude that under the facts of this case, Attorney Riley "offered" false material testimony for which he had a duty to take reasonable remedial measures under former SCR 20:3.3(a)(4) when his client omitted an important fact from his answers on a subject that was clearly material to the hearing conducted by Judge Flynn.

¶59 We note that the current version of the Wisconsin rule, which has been renumbered as SCR 20:3.3(a)(3), makes clear that a lawyer has a duty to take remedial measures whenever (1) false testimony or evidence is presented (i.e., "offered") by the lawyer, the lawyer's client, or a witness called by the

31

lawyer, (2) the false testimony is material to the proceeding in which it is presented, and (3) the lawyer knows of the falsity.[17] The duty to take remedial measures does not arise only when the lawyer has affirmatively elicited the false testimony through pointed questions.

¶60 Attorney Riley also argues that he should have been granted summary judgment because there was insufficient evidence to create a genuine issue regarding his knowledge of Attorney Polk's employment at the new Eisenberg firm and thus, of the falsity of Attorney Polk's answers at the reinstatement hearing.

¶61 The first question that must be answered here is what level or type of knowledge is required. Was the OLR obligated to provide evidence that Attorney Riley should have known of the omission in Attorney Polk's answer or was it required to provide evidence and reasonable inferences that Attorney Riley actually knew of Attorney Polk's employment at the new Eisenberg firm and

---

[17] The current version of SCR 20:3.3(a)(3) provides as follows:

A lawyer shall not knowingly:

. . .

(3) offer evidence that the lawyer knows to be false. If a lawyer, the lawyer's client, or a witness called by the lawyer, has offered material evidence and the lawyer comes to know of its falsity, the lawyer shall take reasonable remedial measures, including, if necessary, disclosure to the tribunal. A lawyer may refuse to offer evidence, other than the testimony of a defendant in a criminal matter that the lawyer reasonably believes is false.

of the omission of that information from Attorney Polk's answer? Attorney Riley argues that the OLR was required to show his "actual knowledge" of the falsity of Attorney Polk's response. The OLR agrees that "actual knowledge" is the appropriate standard under former SCR 20:3.3(a)(4), although it notes that such actual knowledge can be inferred from the surrounding circumstances. We concur that the applicable standard under former SCR 20:3.3(a)(4) is actual knowledge by the attorney. The ABA's preamble to the 1983 Model Rules, upon which former SCR 20:3.3(a)(4) was based, states that the various forms of the word "know" usually denote actual knowledge of the fact in question.[18] ABA Model Rules of Prof'l Conduct, pmbl. (1983). There is no reason to use a different standard of knowledge in this context. The OLR is also correct, however, that knowledge can be inferred from the circumstances. Moreover, since we are addressing this in the context of a summary judgment motion, the OLR correctly points out that the evidence presented and the inferences to be drawn from that evidence were to be viewed most favorably to the OLR as the non-moving party. See, e.g., Affeldt v. Green Lake Cnty., 2011 WI 56, ¶59, 335 Wis. 2d 104, 803 N.W.2d 56.

¶62 We turn now to Attorney Riley's claim that the evidence presented at the summary judgment stage was

---

[18] In the current version of the Wisconsin Rules of Professional Conduct for Attorneys, this definition is now codified in a specific rule, SCR 20:1.0(g).

insufficient under former SCR 20:3.3(a)(4) to show his actual knowledge of Attorney Polk's employment at the new Eisenberg firm. Attorney Riley asserts that the OLR presented only Attorney Polk's speculation as to what Attorney Riley actually knew and that any opinions offered by Attorney Polk on this issue were inadmissible as lay opinions.

¶63 We conclude that there was a genuine issue of material fact on the issue of Attorney Riley's knowledge, and his summary judgment motion was therefore properly denied. Attorney Polk gave the opinion in his deposition testimony that Attorney Riley knew that he was employed by the new Eisenberg firm. Attorney Polk was competent to give such a lay opinion because he explained that it was based on his personal perceptions of the daily activities at the firm. He said that during the relevant time period, he was at the firm 50-60 hours per week, working in an office assigned to him, walking around with client intake packets, making telephone calls, and going back and forth to and from the copier. Moreover, he specifically testified that Attorney Riley "absolutely" saw him doing all of these things. Attorney Polk's personal observations of Attorney Riley seeing him do all of these tasks that correspond with working in a law firm provided Attorney Polk with a proper basis for opining that Attorney Riley knew he was working for the firm in at least some capacity. Indeed, Attorney Polk's daily experiences in the firm during the period of his employment led to him to state that it was common knowledge among all individuals connected with the firm at that time that Attorney Polk was employed by the firm

and indeed was representing himself as an attorney to people outside the firm.

¶64 In addition, although Attorney Riley attempts to attack Attorney Polk's credibility, Attorney Polk did explicitly testify at his deposition that he had at least one discussion with Attorney Riley prior to the reinstatement hearing regarding his concern about having held himself out as an attorney while he had been employed by the new Eisenberg firm. Contrary to Attorney Riley's arguments, the referee was not free to ignore or discount this statement when determining whether there was a genuine dispute of material fact in the summary judgment context.

¶65 These statements by Attorney Polk and the reasonable inferences that could be drawn from them were sufficient to establish clearly and convincingly that Attorney Riley knew before the September 6, 2006 reinstatement hearing that Attorney Polk had been employed by the new Eisenberg firm during the period of his administrative suspension.

¶66 Attorney Riley also argues that he should have been granted summary judgment with respect to the OLR's claim that he had violated SCR 20:3.4(b), which provides that a lawyer "shall not falsify evidence, counsel or assist a witness to testify falsely, or offer an inducement to a witness that is prohibited by law." SCR 20:3.4(b). In this case, there is no evidence that Attorney Riley personally falsified any evidence or offered a prohibited inducement to Attorney Polk for his testimony at the reinstatement hearing. The question in this instance is

35

whether Attorney Riley's conduct at the reinstatement hearing constitutes counseling or assisting a witness to testify falsely.

¶67 Attorney Riley asserts that the Wisconsin disciplinary decisions that have found a violation of SCR 20:3.4(b) have involved situations where the lawyer either actively instructed or coached a witness to lie or personally falsified evidence. See, e.g., Alia, 288 Wis. 2d 299 (altering expert report without expert's permission); In re Disciplinary Proceedings Against Arthur, 2005 WI 40, 279 Wis. 2d 583, 694 N.W.2d 910 (instructing client to lie); In re Disciplinary Proceedings Against Salmen, 187 Wis. 2d 318, 522 N.W.2d 779 (1994) (attorney testifying that letter he back-dated was genuine). Attorney Riley contends that the court's previous application of the rule to these situations means that the rule is limited to such instances. Because there is no evidence that he instructed Attorney Polk to omit any mention of his employment at the reinstatement hearing, Attorney Riley argues that this charge should have been dismissed.

¶68 We acknowledge that this court has not previously decided whether SCR 20:3.4(b) applies to situations where a lawyer's client testifies falsely, but there is no evidence of prior coaching by the lawyer or other assistance by the lawyer to permit the false testimony.

¶69 We agree with Attorney Riley that the language of the rule ("counsel or assist a witness") indicates that some action by the lawyer prior to or at the time of the witness's false testimony is required. In our view, failing to take action in

the face of another's decision to give false testimony is different from "assisting" another person to give false testimony. If SCR 20:3.4(b) is interpreted broadly to cover all situations where a witness has testified falsely and the lawyer fails to take remedial measures, then it would appear to cover the same ground as former SCR 20:3.3(a)(4), and there would be no need to have two separate rules.

¶70 We believe that SCR 20:3.4(b) should not be interpreted to reach the conduct that is shown on this record. There was no evidence in the summary judgment materials (or even in the evidence presented at the subsequent disciplinary hearing) that Attorney Riley advised Attorney Polk not to mention his work at the new Eisenberg firm, planned a way in which Attorney Polk could omit that information in his testimony at the reinstatement hearing, or even knew that Attorney Polk intended to provide a list of his employers during his suspension that would omit the new Eisenberg firm. Attorney Polk stated that although he did at some point prior to his reinstatement hearing discuss with Attorney Riley his concern about having represented himself as an attorney employed by the new Eisenberg firm, there is no indication in the summary judgment record here that the two of them took the step of discussing how Attorney Polk should address that concern in his reinstatement hearing testimony. Indeed, Attorney Polk testified that he and Attorney Riley never had a preparation session to discuss his upcoming testimony at the reinstatement hearing. The most the record in this disciplinary proceeding

37

discloses is that Attorney Polk gave false testimony at the reinstatement hearing and that Attorney Riley knew of the omission. While Attorney Riley's knowledge of the falsity of Attorney Polk's answer at the time the answer was given was sufficient to require him to take reasonable steps to remediate the false testimony and to support a violation of former SCR 20:3.3(a)(4) for not doing so, we do not believe that Attorney Riley's knowledge, by itself, constitutes counseling or assisting Attorney Polk's false testimony in violation of SCR 20:3.4(b). Consequently, we conclude that the OLR's charge of a violation of SCR 20:3.4(b) must be dismissed.

¶71 Attorney Riley's final argument regarding summary judgment is comprised of merely four sentences claiming that there was simply no evidence of dishonesty, fraud, deceit, or misrepresentation, such that he could not have violated SCR 20:8.4(c). As an initial matter, this claim is not sufficiently developed and could be rejected on just that basis alone.

¶72 Even reaching the merits, we conclude that there was sufficient evidence of a violation of this rule to warrant an evidentiary hearing. The language of SCR 20:8.4(c) is broad, covering "conduct involving dishonesty, fraud, deceit or misrepresentation." SCR 20:8.4(c) (emphasis added). In addition, it should be noted that, like former SCR 20:3.3(a)(4), this rule covers not only affirmative misrepresentations, but also deceitful omissions. See Knickmeier, 275 Wis. 2d 69, ¶93. While in this case the primary deceitful words came out of the

38

mouth of Attorney Polk and not the mouth of Attorney Riley, as discussed above in connection with the evidence to support a prima facie case of a violation of former SCR 20:3.3(a)(4), there was evidence at the summary judgment stage that Attorney Riley knew of the deceitful omissions but did nothing to remedy the falsehood.  To the contrary, the transcript shows that he pushed on with the reinstatement hearing and even argued in closing argument to Judge Flynn that Attorney Polk had always intended to pay off the outstanding judgments, but had been unable to do so because of the types of jobs he had been able to find during his administrative suspension, thereby taking advantage of the omission in Attorney Polk's testimony.  In our view, that evidence is sufficient to qualify as engaging in conduct involving deceit or misrepresentation.

B. Appeal of Referee's Final Report and Recommendation

¶73 Attorney Riley also raises several challenges to the referee's final report.  When the court reviews a referee's final report, it affirms a referee's findings of fact unless they are found to be clearly erroneous, but it reviews the referee's conclusions of law on a de novo basis.  In re Disciplinary Proceedings Against Inglimo, 2007 WI 126, ¶5, 305 Wis. 2d 71,  740 N.W.2d 125.  Although a referee makes a recommendation regarding an appropriate sanction, which the court takes into account, it is this court which ultimately makes an independent determination of the appropriate level of discipline given the particular facts of each case.  Alia, 288

Wis. 2d 299, ¶88; In re Disciplinary Proceedings Against Widule, 2003 WI 34, ¶44, 261 Wis. 2d 45, 660 N.W.2d 686.

¶74 Attorney Riley's initial argument regarding the referee's final report is that the referee's credibility finding regarding Attorney Polk's testimony was clearly erroneous, particularly the referee's acceptance of Attorney Polk's testimony that he and Attorney Riley had spoken before his reinstatement hearing about Attorney Polk's concern over having represented himself as an attorney during his employment with the new Eisenberg firm. Attorney Riley characterizes Attorney Polk's testimony as "all over the place" and contends that there was a discrepancy between Attorney Polk's deposition testimony and his testimony at the disciplinary hearing. Attorney Riley contrasts Attorney Polk's testimony with his own testimony, which he characterizes as consistent as well as "firm and forthright."

¶75 We find no legal basis to overturn the referee's credibility determinations with respect to either Attorney Polk or Attorney Riley. While all factual findings are subject to the clearly erroneous standard, credibility assessments are among the most difficult for a party to overturn because, where there is conflicting testimony, the referee is the ultimate arbiter of witness credibility. In re Disciplinary Proceedings Against Riordan, 2012 WI 125, ¶28, 345 Wis. 2d 42, 824 N.W.2d 441; In re Disciplinary Proceedings Against Pump, 120 Wis. 2d 422, 426, 355 N.W.2d 248 (1984). Although Attorney Riley points to what he perceives as discrepancies in Attorney

Polk's testimony, Attorney Polk explained at the disciplinary hearing that he was confused to some extent by the manner in which the time period had been framed in certain questions. While Attorney Polk in his hearing testimony indicated that he did not recall discussing with Attorney Riley his law firm employment and his resulting concerns during the time he was actually employed by the new Eisenberg firm, at two separate junctures in his hearing testimony in this proceeding he clearly and unequivocally testified that he did have such discussions with Attorney Riley prior to his reinstatement hearing. Moreover, as the referee pointed out, Attorney Polk's testimony was against his own interest because he had to admit that he had lied at the reinstatement hearing after having thought about the issue and after having discussed his concerns with another attorney, all of which is detrimental to any future attempt at reinstatement by Attorney Polk. The referee was entitled to accept Attorney Polk's testimony on this point and to reject Attorney Riley's claims to the contrary. The applicable standard of review requires that we accept those credibility findings.

¶76 Based in large part on Attorney Polk's testimony, the referee therefore found that Attorney Riley had discussed Attorney Polk's law firm employment with him prior to the September 2006 reinstatement hearing. Because this rests on a credibility determination that the referee was entitled to make, this finding is not clearly erroneous. This finding also supports the further finding that Attorney Riley knew of

41

Attorney Polk's employment with the new Eisenberg firm at the time of the 2006 reinstatement hearing, at which Attorney Polk gave a misleading answer to a question posed by Attorney Riley, as well as multiple cross-examination questions posed by counsel for the OLR. Attorney Riley does not claim that he ever attempted to persuade Attorney Polk to disclose his law firm employment to Judge Flynn or to take any other measures to remediate Attorney Polk's misleading testimony. We conclude that none of the referee's factual findings on these matters are clearly erroneous, and we therefore rely on them for our legal analysis.

¶77 Attorney Riley also criticizes the referee's conclusions of law and her discussion of how she analyzed the evidence presented to her in light of the charged rule violations. We need not dwell on the referee's extended discussion of the complicating factors present in this case or the interplay between the standards for reinstatements from disciplinary and administrative suspensions. The bottom line in our view is that the facts as found by the referee demonstrate clearly and convincingly that Attorney Riley violated former SCR 20:3.3(a)(4) by offering material testimony from Attorney Polk regarding his employment history that Attorney Riley knew to be false by omission at the time it was given and then failing to

take reasonable measures to remediate that false testimony.[19]  We therefore agree with the referee's conclusion that Attorney Riley violated former SCR 20:3.3(a)(4).

¶78 Attorney Riley also makes a brief argument that the referee's conclusion and discussion of a violation of SCR 20:8.4(c) lack factual and legal support.  Like his argument regarding the referee's summary judgment ruling on this charge, his argument regarding the referee's ultimate conclusion of a violation of SCR 20:8.4(c) is not well developed.  For the reasons set forth above in connection with the referee's summary judgment decision, we conclude that the facts as found by the referee regarding Attorney Riley's knowledge of Attorney Polk's misleading testimony and Attorney Riley's continuing to advocate for Attorney Polk's reinstatement also support a legal

---

[19] One of Attorney Riley's criticisms is directed toward the referee's observation that after the OLR in 2008 told Attorney Riley that it had learned of Attorney Polk's employment with the new Eisenberg firm, Attorney Riley did not take remedial measures at that time by notifying Judge Flynn, this court, or the OLR that Attorney Polk's 2006 testimony had been false by omission.  Attorney Riley argues that he had no duty to take remedial measures at that point because this court had by that time already denied Attorney Polk's reinstatement petition and the OLR already knew the relevant facts.  Again, we need not address whether the rule required additional action by Attorney Riley in 2008.  It is clear from the facts found by the referee that Attorney Riley knew of the falsity in Attorney Polk's testimony at the time it was given.  He had a duty to take remedial measures at that time.  His failure to take proper actions at that time is sufficient to support a conclusion of a violation of former SCR 20:3.3(a)(4).

43

conclusion that Attorney Riley engaged in conduct involving deceit and misrepresentation, in violation of SCR 20:8.4(c).

¶79  Finally, Attorney Riley attacks the OLR's process for investigating and litigating this case, arguing that he never should have been charged with ethical violations in the first place because the OLR's investigation was flawed and there was no cause to proceed.  We need not address these claims in any detail.  Many of Attorney Riley's claims in this regard, such as a lack of materiality of Attorney Polk's false testimony, have already been considered and rejected above.  To the extent Attorney Riley challenges the Preliminary Review Committee's finding of cause to proceed, we believe it is sufficient to note that the subsequent complaint filed by the OLR survived summary judgment and is ultimately resulting in a conclusion by a majority of the court that Attorney Riley committed two violations of the Rules of Professional Conduct for Attorneys.

## C. Level of Discipline

¶80  We now turn to the matter of the proper level of discipline that we believe should be imposed for the two ethical violations we have found.  The referee has recommended that Attorney Riley be publicly reprimanded for his professional misconduct.  In addition to considering prior disciplinary decisions cited by the OLR, the referee also noted three aggravating factors and one mitigating factor.  The three aggravating factors were Attorney Riley's prior private reprimand, his refusal to acknowledge the wrongful nature of his conduct, and the harm to the judicial system caused by his

misconduct.[20] Although the OLR alleged that there were no mitigating factors, the referee found that Attorney Riley had fully cooperated with the OLR's investigation and the litigation of the disciplinary case, which should be acknowledged.

¶81 Attorney Riley does not challenge the referee's recommendation regarding the appropriate level of discipline, other than to argue that he committed no misconduct. Whether or not a respondent attorney specifically challenges a discipline recommendation, however, the court is obligated to conduct its own analysis of the proper level of discipline.

¶82 In our view, a public reprimand is an appropriate sanction for Attorney Riley's professional misconduct. We believe that a public sanction is necessary to impress upon Attorney Riley the wrongfulness of his conduct, as well as to deter both him and other attorneys from engaging in similar conduct in the future. Allowing false evidence to be presented to a tribunal when the attorney knows it is false is a serious

---

[20] Specifically, the referee asserted that Attorney Riley had "misused the justice system" by participating in the offering of false evidence in an optional reinstatement proceeding that needlessly resulted in review and the preparation of a split decision by this court. Attorney Riley objects to this assertion, stating that this court's rules required it to review and issue a decision on Attorney Polk's reinstatement petition regardless of whether Attorney Polk made a false statement at the reinstatement hearing. Attorney Riley is correct regarding this court's review, but his failure to take remedial measures harmed the judicial process of reviewing the petition because this court was forced to review a false account of the facts.

45

ethical violation that undermines the truth-seeking function of the entire judicial system and contradicts the ideal of an attorney being an officer of the court as well as an advocate for a particular client.

¶83 We consider a consensual public reprimand accepted by an assistant district attorney for similar conduct. Public Reprimand of Holly L. Bunch, No. 2009-12 )(electronic copy available at https://compendium.wicourts.gov/app/raw/002196.html). Although Attorney Bunch was aware of two police reports stating that a defendant had expressly denied committing the charged crimes, she made multiple false statements to the jury that the defendant had never denied committing the crime until he had been on the witness stand at trial because those reports had not been entered into evidence.

¶84 Although Attorney Riley's misconduct is clearly serious because it undermined a tribunal's ability to decide a pending matter based on true and complete information, it is not more serious than the misconduct committed by Attorney Bunch. There is no evidence in this record that he conspired with Attorney Polk prior to the reinstatement hearing to omit any reference to Attorney Polk's employment with the new Eisenberg firm or that he even knew prior to the reinstatement hearing that Attorney Polk was planning to omit that information from his testimony. Attorney Riley's misconduct here was failing to take any reasonable measures to remediate the false testimony given by Attorney Polk, his client. Consequently, we conclude

46

that a public reprimand is the most appropriate disciplinary sanction, given the particular facts of this case.

¶85 Finally, we address the issue of costs. Attorney Riley did not object to the OLR's statement of costs. We see no reason in this case to depart from the court's general practice of imposing full costs against an attorney who is found to have committed professional misconduct. See SCR 22.24(1m). Because two concurring justices also agree with this conclusion, Attorney Riley will be obligated to pay the full costs of this proceeding.

¶86 In summary, we conclude that Attorney Riley "offered" false testimony to the reinstatement referee under former SCR 20:3.3(a)(4) when his client gave false and misleading answers to a question that he posed and to questions posed by opposing counsel. We further conclude, based on the referee's factual findings, that Attorney Riley knew this testimony was false at the time it was given. Attorney Polk's false testimony was material to the reinstatement proceeding in which it was given because it related to his claimed inability to pay the outstanding civil judgments against him, which was one of the topics expressly identified in our order referring the reinstatement matter to the referee. Because Attorney Riley did not take any reasonable measures to remediate the false testimony given by Attorney Polk and therefore offered by Attorney Riley, he violated former SCR 20:3.3(a)(4). Given his failure to take remedial measures and his continuing to argue in the reinstatement proceeding that the jobs Attorney Polk had

47

held during his administrative suspension did not provide enough income for him to have made payments toward the outstanding civil judgments, Attorney Riley also violated SCR 20:8.4(c).

¶87 While two of our colleagues who concur in the mandate of the court are not willing to sign on to this opinion, the outcome of this case should still serve as a reminder to attorneys in this state that under the current version of the rule, SCR 20:3.3(a)(3), they have a duty to take reasonable remedial measures whenever they have actual knowledge that material testimony given by a client or another witness called by the attorney is false, either because of an affirmatively untrue statement or an omission that makes the statement false, regardless of whether the attorney asked the question that led to the false testimony. That standard was met by the particular facts of this case with respect to false testimony given by Attorney Riley's client. This rule, in either its former or current form, however, does not make an attorney the guarantor of the factual accuracy of everything that is said by a client or other witness called by the attorney. The attorney's obligation arises only when the attorney has actual knowledge of the falsity and only when the false testimony is material to the proceeding. When those conditions are present, however, the lawyer may not just sit silently and allow the false testimony to mislead the opposing party and the tribunal. The lawyer is not just a zealous advocate on behalf of a client, but also an officer of the court, who bears obligations to assist the court in its search for the truth.

48

¶88  IT IS ORDERED that John Kenyatta Riley is publicly reprimanded for his professional misconduct.

¶89  IT IS FURTHER ORDERED that within 60 days of the date of this order, John Kenyatta Riley shall pay to the Office of Lawyer Regulation the costs of this proceeding.

¶90  IT IS FURTHER ORDERED that the director of the Office of Lawyer Regulation shall advise the court if there has not been full compliance with all conditions of this order.

¶91  REBECCA G. BRADLEY, J., did not participate.

¶92 SHIRLEY S. ABRAHAMSON, J. *(concurring)*. I agree that a public reprimand and full costs should be imposed. I do not, however, join the opinion of three justices of this court. The opinion of the three justices is not a majority opinion. It is, in the terminology of the court, a "lead opinion."

¶93 The phrase "lead opinion" is not, as far as I am aware, defined in our Internal Operating Procedures or elsewhere in the case law. Our Internal Operating Procedures (IOP) refer to "lead opinions," but only in stating that if, during the process of circulating and revising opinions, "the opinion originally circulated as the majority opinion does not garner the vote of a majority of the court, it shall be referred to in separate writings as the 'lead opinion.'" Wis. S. Ct. IOP II.G.4.[1]

¶94 I would describe a lead opinion as one that states (and agrees with) the mandate of a majority of the justices, but represents the reasoning of less than a majority of the participating justices. So, for example, in a case with six justices participating, if three justices join one opinion, two justices join the same mandate only or join a different opinion reaching the same mandate, and one justice dissents, there is a single mandate, but no majority opinion. See Hoffer Props. LLC v. DOT, 2016 WI 5, 366 Wis. 2d 372, 874 N.W.2d 533. Rather, one

---

[1] Our internal operating procedures are contained in volume 6 of the Wisconsin Statutes.

of the opinions agreeing with the mandate will be designated the lead opinion.

¶95 The use of the term "lead opinion" without an agreed-upon definition has the potential to cause confusion among the bench, the bar, and the public. Also, the precedential effect (or lack thereof) of a "lead opinion" is uncertain. Are lead opinions in this court comparable to plurality opinions in the United States Supreme Court?[2] Apparently, the court of appeals considers a plurality decision of this court persuasive but does not always consider it binding. See, e.g., State v. King, 205 Wis. 2d 81, 88-89, 555 N.W.2d 189 (Ct. App. 1996) (citing State v. Dowe, 120 Wis. 2d 192, 194, 352 N.W.2d 660 (1984)).

¶96 I write separately to express several concerns.

I

¶97 The lead opinion is overly lengthy, and gratuitously addresses too many issues that have not been fully briefed or carefully studied. The issues are difficult and of the utmost

---

[2] See Marks v. United States, 430 U.S. 188, 193 (1977) ("When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgment on the narrowest grounds . . . .'") (quoting Gregg v. Georgia, 428 U.S. 153, 169 n.15 (1976) (opinion of Stewart, Powell, and Stevens, JJ.)).

For discussions by this court of the precedential effect of plurality opinions in the United States Supreme Court, see, for example, State v. Griep, 2015 WI 40, ¶36, 361 Wis. 2d 657, 863 N.W.2d 567; State v. Deadwiller, 2013 WI 75, ¶30, 350 Wis. 2d 138, 834 N.W.2d 362.

importance to attorneys and disciplinary proceedings. The issues need more consideration.

¶98 The issues might be better left for future study by a committee this court should create to review the entire Rules of Professional Conduct for Attorneys, as I proposed in Rule Petition 15-01. Instead, the court dismissed the petition. The ruse for dismissal was that the creation of a committee is not a proper subject for a rule petition. For a discussion of the need for a committee, see my dissent to the order dismissing Rule Petitions 15-01, available at https://www.wicourts.gov/sc/rulhear/DisplayDocument.pdf?content=pdf&seqNo=158416; In re Disciplinary Proceedings Against Templin, 2016 WI 18, ¶¶55-60, 367 Wis. 2d 351, 877 N.W.2d 107 (Abrahamson, J., concurring); In the Petition for Reinstatement of Attorney Jeffrey P. Neterval, unpublished order, ¶¶2-9 (Mar. 22, 2016) (Abrahamson, J., concurring); In the matter of the Reactivation of David W. Klaudt's License to Practice Law in Wisconsin, unpublished order, ¶¶3-11 (Mar. 22, 2016) (Abrahamson, J., concurring).

II

¶99 This is a landmark case in attorney discipline, as Justice Prosser has pronounced. But its landmark status, from my perspective, is the length of time the instant case has lingered in this court. I think it wins the prize for taking longer to decide than any other OLR proceeding I can remember or find. It is a prime example of significant, unnecessary delays in completing a disciplinary matter. Delay appears to exist at

3

every level of the disciplinary proceedings, but the final delay at this court in releasing the lead opinion is outrageous.

¶100 The attorney's conduct that is the subject of this proceeding dates back to 2006. The OLR complaint was filed on December 1, 2010. The referee held hearings in February 2012 and issued her report on April 18, 2012.

¶101 On October 23, 2012, this court held oral argument in the instant case. More than 10 months elapsed before staff circulated a draft per curiam opinion. Justice David T. Prosser circulated the first draft of his dissent to the court on July 31, 2015, almost three years after oral argument and almost two years after the per curiam was circulated. The first draft of my concurrence was circulated on September 14, 2015, almost two months after the dissent was circulated. The writings have been subject to discussion and revision, and this opinion is being released almost four years after oral argument, almost six years after the complaint was filed, and almost 10 years after the conduct at issue.

¶102 I favor the court's spending the time needed for each matter and giving utmost care to each matter. Opinions and orders in cases, rule matters, and disciplinary proceedings are important to the people directly involved in each case and to the public.

¶103 I strongly support the court's longstanding practice of honoring a justice's hold and giving a justice time to study and write separately, but I disfavor the court's inconsistent treatment of requests to hold. Consistency in the court's

4

practice of allowing, disallowing, and limiting holds is important for collegiality and fairness to the litigants and public. For a discussions of the court's failure to follow procedures it adopts, see State v. Finley, No. 2014AP2488-CR, unpublished order (Jan. 11, 2016) (Abrahamson, J., concurring in part and dissenting in part); Wis. Carry, Inc. v. City of Madison, No. 2015AP146, unpublished order (Jan. 11, 2016) (Abrahamson, J., concurring in part and dissenting in part); Regency West Apartments LLC v. City of Racine, No. 2014AP2947, unpublished order (Jan. 11, 2016) (Abrahamson, J., concurring in part and dissenting in part).

¶104 Although I favor the practice of permitting holds, I also strongly favor giving litigants and the public prompt decisions. Thus I again urge the court to create uniform time limits for court staff and for justices to study the matter and write. For my repeated requests, see, for example, my concurrences in State ex rel. Nelson v. Wis. Supreme Court, No. 2013AP153-W, unpublished order (Aug. 19, 2015), and Koll v. Department of Justice, No. 2008AP2027, unpublished order (Oct. 14, 2011).

¶105 Neither the public, the respondent lawyer, the component parts of the disciplinary proceedings, nor the other lawyers of the state are well served by the long delay in the instant case and in too many other cases.

¶106 The court is considering (in closed conference rather than in open conference) appointing a committee to review the procedures of the component parts of the OLR and to make

recommendations for change. See Rule Order 15-01, available at https://www.wicourts.gov/sc/rulhear/DisplayDocument.pdf?content= pdf&seqNo=158416 (stating that dismissal of petition does not preclude the court from appointing a committee to study the Office of Lawyer Regulation or the Wisconsin Judicial Code). Although no committee has been formed as of this date, exploring ways to avoid unnecessary delay and accelerate the process of attorney discipline will be an important aspect of any study.

### III

¶107 To foster transparency and fairness, as well as to encourage promptness and uniformity in the court's decisions in discipline cases, I renew my request that the court require the Clerk of the Supreme Court to make available on the court's website information about the dates of the relevant steps in each disciplinary matter, from the filing of the complaint, to its passage through the component parts of the lawyer regulatory proceeding, assignment to a court commissioner, assignment for oral argument or on-brief consideration, and the court's ultimate decision.

¶108 The United States Supreme Court has similar helpful information available on its website for litigants and interested persons about the progress of petitions for certiorari in the Supreme Court.[3] See my concurrence in State ex

---

[3] I have also suggested that similar information be provided online for petitions for review, petitions for bypass, and original actions filed in this court.

rel. Nelson v. Wis. Supreme Court, No. 2013AP153-W, unpublished order (Aug. 19, 2015).

¶109 For the reasons set forth, I do not join the opinion of the three justices and write separately to set forth my concerns.

¶110 I am authorized to state that Justice ANN WALSH BRADLEY joins Part I of this opinion.

¶111 ANN WALSH BRADLEY, J. *(concurring).* Although I agree with the imposition of a public reprimand and full costs, I do not join the lead opinion. Instead, I join Part I of the above concurrence.

¶112 DAVID T. PROSSER, J. *(dissenting).* This is a landmark case in attorney discipline. It addresses the issue of an attorney's ethical responsibilities when the attorney's client——or a witness called by the attorney——provides false testimony that the attorney knows is false at the time of the testimony <u>or</u> learns is false sometime after the testimony.

¶113 It is hard for a judge not to sound the trumpet and wave the flag for "the truth, the whole truth, and nothing but the truth" in judicial proceedings. No one in the judiciary is "for" false testimony. Yet the court's lead opinion, which emphatically embraces the necessity for "truth" in judicial proceedings, leaves me quite uncomfortable for a number of reasons.

¶114 First, this notable case will be associated with an attorney who was caught in the middle of a mess he did not create, whereas the two attorneys who are responsible for the mess have been able to walk away with inadequate discipline or no discipline.

¶115 Second, I do not perceive that the respondent attorney set out to misrepresent critical facts to a referee. This is a case in which the attorney was "directed" by his senior partner to represent another attorney, without pay. When the attorney asked the "client" attorney questions on direct examination, the "client" attorney omitted important information from his answers, and when the "client" attorney answered questions on cross examination, he lied. This court determines that the

1

respondent attorney assigned to represent the "client" attorney had an obligation "to take reasonable remedial measures" to correct his client's false testimony——even if the attorney did not learn of the falsity until sometime after the testimony was given——and that all attorneys have such a duty. However, the opinion does not say much about how this duty should be discharged.

¶116 Third, the lead opinion is a little light in discussion about the serious tension between privileged information, confidentiality, and loyalty to a client, on the one hand, and an attorney's obligation to the court, on the other.

¶117 Finally, the lead opinion is almost 50 pages in length because the court finds it necessary to resolve several close questions against the respondent attorney, but it reads as though the respondent attorney should have resolved all these subtle questions the same way the lead opinion has resolved them . . . without much difficulty. We ought to ask: Has the court provided sufficient guidance for the Wisconsin bar to avoid in the future the same pitfalls that the attorney faced in this case?

I

¶118 The background facts in this case are complicated and murky. Several important facts are omitted from the lead opinion in an effort to eliminate uncertainty by simply ignoring it.

¶119 At one point, about 2000, Attorneys Alvin Eisenberg, Brian K. Polk, and the respondent, John Kenyatta Riley, all

worked at the firm of Eisenberg, Weigel, Carlson, Blau, Reitz & Clemens, S.C. in Milwaukee.

¶120 Attorney Polk left the firm in June 2000 and permitted his license to be suspended in 2001 because of noncompliance with CLE.

¶121 Attorney Riley left the firm sometime in 2000-2001 to join another firm. He started his own law firm in Milwaukee in 2003.

¶122 In 1990 six attorneys acquired shares in the firm that Attorney Eisenberg had founded in 1958. In 1999 Joseph Weigel became president of that firm and engineered the redemption of all stock owned by Eisenberg. Thereafter:

> In January 2005 the Firm, without giving prior notice to Attorney Eisenberg, moved its law office to a new location. A letter was left for Attorney Eisenberg saying there was no office space for him at the new location, that he should go home, and that his paychecks would be sent to him.

In re Disciplinary Proceedings Against Weigel, 2012 WI 71, ¶¶8, 9, 12, 342 Wis. 2d 129, 817 N.W.2d 835.

¶123 Ugly litigation followed Attorney Eisenberg's departure from his old law firm, and soon, he started a new firm. He brought Brian Polk into the new firm no later than October 10, 2005, even though Polk's law license was suspended.

¶124 Eisenberg also brought Attorney Riley into the new firm sometime in 2005. The referee found as fact that, "[b]etween October 2005 and September of 2006, Attorney Riley was an associate at the Eisenberg law firm. Attorney Riley maintained his solo practice offices on Water Street for a short

3

while after re-joining Attorney Eisenberg in practice. His work time was spent between both offices."

¶125 The referee also found that, "[Riley] practiced solo until early 2006 when he joined Eisenberg Law Office, which later came to be Eisenberg & Riley then Eisenberg, Riley & Muwonge, and in 2011 was Eisenberg, Riley & Zimmerman." (Emphasis added.)

¶126 Attorney Riley was not part of the new Eisenberg firm's personal injury group in which Polk worked. Rather, he had a general practice, which included bankruptcy, criminal, and real estate law. He often was in court when the personal injury group met.

¶127 These facts suggest that it is not entirely clear whether Attorney Riley knew the full story about Polk's role at the new Eisenberg firm. What is undisputed is that Polk filed a pro se petition for readmission to the bar on February 22, 2006; and because of opposition to reinstatement by the Office of Lawyer Regulation (OLR), this court appointed a referee, who conducted a hearing on September 6, 2006.

¶128 Attorney Eisenberg "directed" Attorney Riley to represent Polk at that hearing. The referee in this case found that "[t]he reinstatement hearing [in 2006] was pending at the same time law firm disputes and other practice concerns were in play." The referee in this case also found:

> The attorney-client relationship between Attorney Riley and Brian Polk was limited to Attorney Riley appearing at the reinstatement trial in a "second-chair" capacity. The representation did not include Attorney Riley's preparation of the witnesses, drafting of the petition, prior review of the record,

4

strategy sessions or consultation, solicitation of testimony based on this reinstatement trial's court-ordered standards, attention to or analysis of answers to questions. [Attorney Riley] had not previously represented any clients in Reinstatement [and] disciplinary proceedings were not within Attorney Riley's usual area of practice.

(Citations omitted.)

¶129 The critical question is when Attorney Riley actually knew that Polk was improperly employed by the Eisenberg law firm. Did he know it on September 6, 2006, or did he learn it later?

¶130 The referee found that "Attorney Riley and Brian Polk spoke about his law firm employment during 2006 when he was serving as counsel for Brian Polk."

¶131 Attorney Riley disputes this finding. The lead opinion asserts that it was "not necessary that Attorney Riley knew that Attorney Polk was practicing law (as opposed to simply working) at the new Eisenberg firm, in order for Attorney Riley to have violated former SCR 20:3.3(a)(4)," lead op., ¶47 (emphasis omitted), because "a lawyer has a duty to remediate false testimony given by a client, regardless of the manner in which the false testimony was given," id., ¶57. The lead opinion states that a lawyer had a duty to take reasonable remedial measures under former SCR 20:3.3(a)(4) when his client omitted an "important fact" from his answers on a subject that was "material." Id., ¶58.

¶132 What should be evident to everyone is that Alvin Eisenberg is the person responsible for employing Brian Polk, an attorney with a deeply troubled past, including a felony conviction and a citation for loitering-illegal drug activity,

5

while Polk was suspended from the practice of law. Eisenberg tried hard to hide Polk's role in the firm. Eisenberg was purportedly paranoid that his rivals at the Weigel law firm would discover and disclose Polk's employment, discrediting Eisenberg and discrediting the firm. Eisenberg "directed" Attorney Riley to assist Polk at the reinstatement hearing. He knew he could not do it himself.

¶133 Eisenberg eventually was disciplined by OLR with a public reprimand. Public Reprimand of Alvin H. Eisenberg, 2012-8. However, his "public reprimand" is not published in the Wisconsin Reports, and it takes a little detective work even to find it online. Moreover, the reprimand reads in part:

> In a May 10, 2008 response to this matter, Eisenberg stated that, in March of 2006, he discovered Mr. X's license to practice law was suspended, causing Eisenberg to terminate Mr. X and tell him he could not return until his license was reinstated. Eisenberg further stated that, "[Mr. X] has not returned to this date."

> This matter was referred to a district committee for investigation. Eisenberg denied to committee investigators that Mr. X had returned to work at the firm after being terminated in March of 2006 and denied that Mr. X used an assumed name. Eisenberg could give no explanation for letters that were produced that had been signed using the assumed name, and he denied authorizing or having knowledge of anyone in the firm using that name.

> In response to the committee report Eisenberg stated that, after reviewing records, he found that Mr. X worked for the firm for six days in July and August 2006. Eisenberg admitted that the firm's receptionist "keeps a detailed daily record of the employees' attendance as employees come and go from the office." Eisenberg should have consulted these records before responding negatively to previous questions about whether Mr. X returned to work at the firm after he was terminated in March 2006.

See https://compendium.wicourts.gov/app/raw/002479.html.

¶134 These three bland paragraphs should be compared to the extensive negative discussion of Attorney Riley in the lead opinion.

¶135 As for Brian Polk (a/k/a "Mr. X"), he was not readmitted to the bar. He did not appeal the referee's ruling not to reinstate him and——to the best of my knowledge——he has not reapplied. But OLR never went after Polk for practicing law without a license or lying to a referee. Consequently, there is no OLR "discipline" on his record.

II

¶136 Attorney Riley was charged with violating three Supreme Court rules: former SCR 20:3.3(a)(4); current SCR 20:3.4(b); and current SCR 20:8.4(c). The text of the rules is significant.

¶137 In 2006 SCR 20:3.3(a)(4) read:

> A lawyer shall not knowingly:
>
> . . . .
>
> (4) <u>offer</u> evidence that the lawyer knows to be false. If a lawyer has offered <u>material evidence</u> and comes to know of its falsity, the lawyer shall take reasonable remedial measures.

(Emphasis added.)

¶138 SCR 20:3.4(b) reads:

> A lawyer shall not:
>
> . . . .
>
> (b) falsify evidence, counsel or assist a witness to testify falsely or offer an inducement to a witness that is prohibited by law.

7

¶139 SCR 20:8.4(c) reads:

It is professional misconduct for a lawyer to:

. . . .

(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation.

¶140 OLR's complaint asserted:

By eliciting and allowing Polk's testimony at Polk's reinstatement hearing regarding Polk's work history during the suspension of Polk's license that omitted Polk's employment at Riley's law firm, Eisenberg & Riley, S.C., when Riley knew of that employment at the time he elicited and allowed that testimony, and his failure to remedy that omission at any time thereafter, Riley violated former SCR 20:3.3(a)(4), SCR 20:3.4(b), and SCR 20:8.4(c).

¶141 Attorney Riley was put in a very difficult situation. He either knew the full story about Polk's employment at the time Polk testified, or he didn't. In either event, if he "offered" the information and if the information was "material" at the reinstatement hearing, the lead opinion asserts that he had a duty to take "reasonable remedial measures." Arguably, if he did not "offer" the information or if the information was not "material," he did not have a duty to take "reasonable remedial measures."

¶142 Assuming the existence of a duty, reasonable remedial measures could be interpreted to mean informing the referee that Polk's testimony was false, which would have had consequences. First, it would have destroyed any chance that Polk would win readmission to the bar. Second, it would almost certainly lead to OLR prosecution of Riley's boss, Alvin Eisenberg. Third, it could seriously affect Riley's relationship with Eisenberg and the law firm, leading to Riley's possible resignation or

8

termination.[1] Fourth, it could damage the law firm. Fifth, it could lead to a suit that Attorney Riley had breached the attorney-client privilege to Polk's detriment. If Attorney Riley knew all the facts about Polk's employment, he may have calculated that he would inform the referee if the referee decided in favor of reinstatement. Of course, the referee decided against reinstatement. The lead opinion has no room for "no harm, no foul."

¶143 It may well be that the legal profession must set high standards of candor and integrity, regardless of the cost to an individual attorney. But shouldn't the court at least acknowledge the heavy stakes in this case and the potential heavy stakes in future cases that will be affected by this decision?

¶144 To illustrate, the rules cited do not exempt attorneys who practice criminal law. What are the practical effects of this case on criminal defense attorneys? What are "reasonable remedial" steps for a criminal defense attorney who knows or learns after his client has testified that his client has lied? I do not sense that the court's decision permits attorneys to look the other way when they know their client has testified falsely or omitted "important facts," even in a criminal case. Clearly, the court does not believe it was enough for Attorney Riley to withdraw as counsel after the hearing, as he did.

---

[1] OLR's reference to "Riley's law firm" is a bit of an exaggeration.

9

¶145 Inasmuch as the referee found that Attorney Riley knew about Polk's employment with Eisenberg at the time of the reinstatement hearing, it may seem unnecessary to discuss what should have happened if he didn't know until later. Notably, however, the court dismisses the alleged violation of SCR 20:3.4(b) of having assisted a witness to testify falsely: A lawyer "shall not . . . counsel or assist a witness to testify falsely . . . ."

¶146 The court says:

> We agree with Attorney Riley that the language of the rule ("counsel or assist a witness") indicates that some action by the lawyer prior to or at the time of the witness's false testimony is required. . . . We believe that SCR 20:3.4(b) should not be interpreted to reach the conduct that is shown on this record. There was no evidence in the summary judgment [record] . . . that Attorney Riley advised Attorney Polk not to mention his work at the new Eisenberg firm, planned a way in which Attorney Polk could omit that information in his testimony . . . , or even knew that Attorney Polk intended to provide a list of his employers during his suspension that would omit the new Eisenberg firm. . . . [T]here is no indication . . . that the two of them took the step of discussing how Attorney Polk should address that concern in his reinstatement hearing testimony. Indeed, Attorney Polk testified that he and Attorney Riley never had a preparation session to discuss his upcoming testimony at the reinstatement hearing.

Lead op., ¶¶69-70.

¶147 Nonetheless, the referee found that "Attorney Riley and Brian Polk spoke about [Polk's] law firm employment during 2006 when [Riley] was serving as counsel for Brian Polk."

¶148 Asking questions at the hearing about Polk's employment history <u>could</u> be viewed as "assisting" a witness to testify falsely. The court declines to take that position. On

10

the other hand, the referee insisted that Attorney Riley knowingly "offered" evidence that he knew to be false. The distinction between knowingly "offering" evidence but not "assisting" is not clear to me in this case.

¶149 If Attorney Riley reasonably believed <u>he</u> did not <u>assist</u> Polk in giving false testimony, it is difficult to understand why he could not reasonably believe that <u>he</u> did not knowingly <u>offer</u> false evidence at the hearing.

¶150 Ethics scholars might wish to compare the word "offer" in former SCR 20:3.3(a)(4) with the word "offer" in SCR 20:3.4(b). How does an attorney "offer an inducement to a witness" if he never mentions an inducement?

¶151 There is another problem inherent in the former rule. It reads in essence that a lawyer shall not knowingly "offer evidence" that the lawyer knows to be false. But then, in the second sentence, the rule provides, "If a lawyer has offered <u>material evidence</u> and comes to know of its falsity, the lawyer shall take reasonable remedial measures." (Emphasis added.) The second sentence establishes a duty to remediate any "material evidence" that is false, irrespective of prior knowledge, but it does not appear to require remediation of false evidence if the false evidence is not "material."

¶152 "Knowingly offer" and "material evidence" thus are terms that raise serious issues for an attorney in ambiguous situations.

¶153 These concerns go beyond the question of <u>how</u> to discharge an attorney's clear duty to the more fundamental question of whether this attorney had a duty.

11

III

¶154 My other concern relates to the tension between an attorney's duties to his client and his duties to the court.

¶155 Wisconsin Stat. § 905.03(2), entitled "GENERAL RULE OF PRIVILEGE," reads:

> A client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client: between the client or the client's representative and the client's lawyer or the lawyer's representative; or between the client's lawyer and the lawyer's representative; or by the client or the client's lawyer to a lawyer representing another in a matter of common interest; or between representatives of the client or between the client and a representative of the client; or between lawyers representing the client.

¶156 There are exceptions to this statute in subsection (4). It would have been useful for the court to discuss the applicable exceptions, _if any_, in this case.

¶157 The same is true with respect to SCR 20:1.6 related to confidentiality: "(a) A lawyer _shall_ not reveal information relating to the representation of a client unless the client gives informed consent, except for disclosures that are impliedly authorized in order to carry out the representation, and except as stated in paras. (b) and (c)." (Emphasis added.) What are the applicable exceptions to this rule for Attorney Riley?

¶158 SCR 20:3.3, Candor toward the tribunal, reads in part: "A lawyer shall not knowingly: (1) make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal _by the_

12

lawyer." This rule about false statements "by the lawyer" strikes me as much clearer and much easier to apply than former SCR 20:3.3(a)(4).

## IV

¶159 To me the lead opinion raises sufficient questions about its impact on the law and its fairness to the respondent that I feel bound to respectfully dissent. It should be noted that the court has not been able to muster a majority of justices for the lead opinion. It should also be noted that the rule of lenity seems to be missing from the Rules of Professional Conduct for Attorneys.